# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SCHANEQUIA WRIGHT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Case No. 3:19-cv-2176-S |
| C. R. BARD, INC. and BARD PERIPHERAL | § | |
| VASCULAR, INC., | § | |
| | § | |
| Defendants. | § | |

## <u>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR TRIAL CONTINUANCE</u>

Richard B. North, Jr.
Georgia Bar No. 545599
Richard.North@nelsonmullins.com
Brandee J. Kowalzyk
Georgia Bar No. 142328
Brandee.Kowalzyk@nelsonmullins.com
Taylor Tapley Daly
Georgia Bar No.697887
Taylor.Daly@nelsonmullins.com
Elizabeth C. Helm – Admitted *Pro Hac Vice*
Georgia Bar No. 289930
Kate.Helm@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000

and

Melissa Dorman Matthews
Texas Bar No. 00790603
mmatthews@hartlinebarger.com
Jordan E. Jarreau
Texas Bar No. 24110049
jjarreau@hartlinebarger.com
**HARTLINE BARGER LLP**
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
Telephone: (214) 369-2100

*Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT AND CITATION OF AUTHORITY ........................................... 4

    A.    A Continuance is Important and Necessary to Protect Bard's Due Process Rights and to Ensure a Full and Fair Trial Conducted with Fundamental Fairness .................................................................. 7

        1.    Bard's witnesses are likely unable to appear in-person at trial. ................................................................................................ 7

        2.    Remote testimony is an inadequate substitute under the circumstances. ........................................................................ 11

        3.    The dangers and burdens from travel singularly impact Bard's counsel. ................................................................................... 15

        4.    The Court's COVID-19 limitations will undermine a full and fair trial. ................................................................................ 17

        5.    The COVID-19 pandemic jeopardizes the ability to impanel an impartial jury from a fair cross-section of the community ..... 18

    B.    A Continuance is Important and Necessary to Protect the Health and Safety of Trial Participants and Their Local Communities. .. 22

    C.    A Continuance Will Not Prejudice Plaintiff and is Available to Cure Any Prejudice. ........................................................................ 24

IV. CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

Cases

*Beck v. QuikTrip Corp.*, 708 F.2d 532 (10th Cir. 1983) ...............................................7

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ...............................................7

*Castaneda v. Partida*, 430 U.S. 482 (1977) ..................................................................19

*Donaire v. BP Expl. & Prod.*, No. 19-235, 2020 U.S. Dist. LEXIS 116334 (E.D. La. July 2, 2020) ...............................................................................................................25

*Doucet v. Owens-Corning Fiberglas Corp.*, 966 S.W.2d 161 (Tex. Ct. App. 1998) ..18

*duPont v. S. Nat. Bank of Houston, Tex.*, 771 F.2d 874 (5th Cir. 1985) .......................7

*Duren v. Missouri*, 439 U.S. 357 (1979) ......................................................................18

*Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334 (5th Cir. 1982) ...........................7

*Hernandez v. Cont'l Am. Corp.*, No. 3:15-CV-0600-D, 2017 WL 2599120 (N.D. Tex. June 15, 2017)..............................................................................................................4

*Hill v. Ozmint*, 339 F.3d 187 (4th Cir. 2003) .................................................................5

*Latiolais v. Whitley*, 93 F.3d 205 (5th Cir. 1996) ..........................................................7

*Lopez v. NTI, LLC*, 748 F. Supp. 2d 471 (D. Md. 2010) .............................................12

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..................................................................11

*McGinnis v. M. I. Harris, Inc.*, 486 F. Supp. 750 (N.D. Tex. 1980) ...........................19

*McMullen v. Bay Ship Mgmt.*, 335 F.3d 215 (3d Cir. 2003).........................................4

*Morin v. Chevron U.S.A., Inc.*, No. CIV.A. 11-0045 G (3), 2012 WL 38384 (E.D. La. Jan. 9, 2012)................................................................................................................5

*Myers v. CitiMortgage, Inc.*, 557 F. App'x 296 (5th Cir. 2014)....................................5

*Quinn v. City of Tuskegee, Alabama*, No. 3:14-CV-1033-ALB, 2020 WL 2846662 (M.D. Ala. June 1, 2020) ...........................................................................................23

*Rusu v. U.S. I.N.S.*, 296 F.3d 316 (4th Cir. 2002)........................................................14

*Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846 (5th Cir. 1996) ........................................3

*Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co.*, 423 F.2d 842 (5th Cir. 1970) .................................................................................................................................5

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-LPS-CJB, 2020 WL 3605623 (D. Del. July 2, 2020) ............................12

*Thiel v. Southern Pacific Co.*, 328 U.S. 217 (1946) ....................................................18

*Thompson v. Madison Cty. Bd. of Ed.*, 476 F.2d 676 (5th Cir. 1973) ..........................7

*Thornton v. Snyder*, 428 F.3d 690 (7th Cir. 2005)......................................................11

*Timmel v. Phillips*, 799 F.2d 1083 (5th Cir. 1986) ......................................................18

*Ungar v. Sarafite*, 376 U.S. 575 (1964)........................................................................5

*United States v. Lawrence*, 248 F.3d 300 (4th Cir. 2001) ...........................................12

*Warger v. Shauers*, 574 U.S. 40 (2014)......................................................................18

*Williams v. City of Cleveland*, 848 F. Supp. 2d 646 (N.D. Miss. 2012)......................19

Statutes

Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 .........................................19

**Rules**

Fed. R. Civ. P. 16(b)(4)..................................................................................................4

Fed. R. Civ. P. 43(a) ....................................................................................................11

## I. INTRODUCTION

The COVID-19 pandemic represents one of the most serious threats to public health and safety that our nation has ever faced with over 7.9 million infections[1] and more than 217,400 deaths to date. For the fifth time this past week and seventh time this month, the United States has reported more than 50,000 daily infections, a level seen only three times in September.[2] The President of the United States was recently hospitalized after contracting the virus despite having the highest level of security, testing, and safety precautions available at the White House, which has become an epicenter for a new outbreak. The threat is very real. Texas in particular has been one of the hardest hit states in the country—second only to California—with over 832,900 infections and more than 17,190 deaths and has declared a state of disaster in all 254 counties in response.[3] Because of this threat, on September 18, 2020, the Supreme Court of Texas extended its prohibition on Texas courts from holding in-person jury trials prior to December 1, 2020.[4] Likewise, on October 14, 2020, the Western District of Texas issued a supplemental order

---

[1] This is an underestimate by as much as 90% of those actually infected. *See* Declaration of Dr. David. W. Feigal, M.D., M.P.H. ("Dr. Feigal Decl.") ¶ 6, Defendants' Appendix ("Appx.") at 185. Dr. Feigal has held senior positions at the Food and Drug Administration ("FDA") from 1992 – 2004—including as former Director of the Center for Devices and Radiological Health (1999 – 2004)—where he "was responsible for products that were used to diagnose, treat or prevent HIV, influenza, cytomegalovirus, tuberculosis, herpes, West Nile virus, anthrax, viral hepatitis and SARS and regularly interacted with … colleagues in the Public Health Service, particularly the CDC, NIH, and Surgeon General as well as with the Assistant Secretary for Health, the Secretary for Health, the White House 'AIDS Czar', Dr. Fauci and others." *Id.* at ¶ 1, Appx. at 183-84.
[2] *See* Don Jacobson, *U.S. adds more than 50k COVID-19 cases for 5th time in past week*, UPI (Oct. 14, 2020 10:07 AM), https://www.upi.com/Top_News/US/2020/10/14/US-adds-more-than-50K-COVID-19-cases-for-5th-time-in-past-week/2831602677187/ ("Cases have risen nearly 15% in the past two weeks, according to Johns Hopkins.").
[3] *See* Johns Hopkins Univ. of Medicine, *COVID-19 Dashboard by the Center for Systems Science and Engineering* (last updated Oct. 15, 2020 3:24 PM), https://coronavirus.jhu.edu/map.html.
[4] *See* Twenty-Sixth Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket No. 20-9112 (Tex. Sept. 18, 2020), *available at* https://www.txcourts.gov/media/1449738/209112.pdf (last visited Oct. 13, 2020).

continuing all trials through November 30, 2020.[5]  It is not yet clear whether these orders will be further extended prior to their expiration.

On August 11, 2020, in recognition of the extraordinary circumstances, this Court *sua sponte* continued the September trials in *Branch*, *Brown*, and *Sweezey*. On September 8, 2020, this Court continued the October trial in *Wright*. The situation has not materially improved since then as coronavirus cases are trending up again in North Texas.[6] One Dallas County Judge recently said infections and hospitalizations are trending "in the wrong direction" with "a 40% increase in hospitalizations since Sept. 27 and a 20% increase since that time in the average number of daily COVID cases."[7] That trend is only expected to get worse following Halloween and Election Day.[8] Yet on September 30, 2020, the Court reset the *Branch*, *Sweezey*, and *Wright* cases for trial beginning December 2, 2020. While Plaintiff wants to proceed to trial in December, there is no justifiable reason to rush to trial when a continuance would better serve the parties, would protect public health, would preserve due process, and would prioritize the pursuit of justice. "[I]f the goal of expediency is given higher priority than the pursuit of justice, then the bench and the bar both

---

[5] *See* Ninth Supp. Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic (W.D. Tex. Oct. 14, 2020), *available at* https://www.txwd.uscourts.gov/coronavirus-covid-19-guidance/ (last visited Oct. 14, 2020).

[6] FOX 4 Staff, *Coronavirus cases trending up again in North Texas*, FOX4NEWS.COM (Oct. 9, 2020), https://www.fox4news.com/news/coronavirus-cases-trending-up-again-in-north-texas.

[7] Michael McCardel & Jason Whitely, *Inside Texas Politics: Dallas County judge says COVID-19 numbers are trending the wrong way to justify opening bars*, WFAA.COM (Oct. 10, 2020 12:00 PM), https://www.wfaa.com/article/news/politics/inside-politics/texas-politics/dallas-county-judge-covid-19-numbers-trending-wrong-way-justify-opening-bars/287-320b8266-fda0-484e-847f-93a1fb379ee5.

[8] *See* WFAA Staff, *COVID-19 updates: Dallas County Judge Jenkins urges caution with Halloween, Red River Showdown, election*, WFAA.COM (Oct. 8, 2020 6:00 PM), https://www.wfaa.com/article/news/health/coronavirus/coronavirus-updates-north-texas-thursday-october-8/287-56691bfd-f7c2-4b8a-88c5-12e4dce80e5b.

will have failed in their duty to uphold the Constitution and the underlying principles upon which our profession is founded." *Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846, 849 (5th Cir. 1996).

A December trial would be much more burdensome and dangerous to Bard than to Plaintiff and would be so lacking in fundamental fairness as to deprive Bard of its due process right to a full and fair trial. Bard's ability to try its case will be seriously impaired as it will likely be without most of its live witnesses, any client representatives, and some of its attorneys at trial due to COVID-19 concerns. Unlike Plaintiff's attorneys and most of her live witnesses who are local, all of Bard's witnesses, attorneys, and client representatives will have to travel to and from Texas, exposing themselves along the way to the risk of contracting COVID-19 and spreading the virus within their communities. Having Bard's witnesses testify remotely with all of its shortcomings will not remedy the unfairness given the imbalance of in-person testimony in Plaintiff's case. The pandemic further jeopardizes the ability to impanel an impartial jury drawn from a fair-cross section of the community, as diversity in race, gender, age, and political affiliation will be lost due to COVID-19's disproportionate impact on certain demographics. A brief delay would protect the public health of trial participants and their communities and would ensure a full and fair trial.

Continuing the December trial would also better serve the parties. Unlike other civil cases proceeding to trial during the pandemic, this is not a stand-alone case unlikely to impact other existing litigation. Rather, this case is one of many similarly situated filter cases across the country. This trial will serve as a quasi-bellwether trial for the litigation. As this Court has acknowledged, the results from this early trial (the first since the MDL bellwether trials in 2018) will have an impact on settlement of other filter cases. Thus, it is even more important that both parties have confidence in the verdict, whatever it shall be. Bard believes, however, that a verdict rendered under these circumstances—which would be so lacking in fundamental fairness as to deprive Bard

- 3 -

of its right to due process—would serve no benefit in furthering the resolution of the litigation as a whole. Instead, it would likely drive the parties' perceived settlement values further apart.

Bard is mindful of this Court's docket and the value the judicial system places on prompt resolution of cases. But there are times when delay is necessary to afford justice to the parties. *See McMullen v. Bay Ship Mgmt.*, 335 F.3d 215, 219 (3d Cir. 2003) ("Although promptness in judicial administration is highly desirable, delay may sometimes be necessary to the mission of doing justice."). The Courts of Appeal "are not unmindful of the need for judicial eagerness to expedite cases, to fully utilize the court's time, to reduce overcrowded calend[a]rs and to establish finality of judgments. However, these commendable aspirations should never be used to thwart the objectives of the blind goddess [of justice]." *Id.* (citations omitted). Indeed, "[s]peed is necessary, and the limited capabilities of the judicial system certainly should be considered…. However, such considerations must be addressed with a cautious respect for the requirements necessary to achieve a fair trial." *Sims*, 77 F.3d at 849. "We are all too often reminded that 'justice delayed is justice denied.' But, it is equally true that in some situations 'justice rushed is justice crushed.'" *McMullen*, 335 F.3d at 219. A December trial during the COVID-19 pandemic with its extraordinary and disproportionate impact on Bard presents just such a situation. Therefore, the trial should be continued to February/March 2021, at the earliest.

## II.  ARGUMENT AND CITATION OF AUTHORITY

Pursuant to Federal Rule of Civil Procedure 16(b)(4), an order scheduling trial may be modified "for good cause and with the judge's consent." The "good cause" inquiry focuses on the diligence of the party seeking to modify the scheduling order and its reasons for seeking modification. *See Hernandez v. Cont'l Am. Corp.*, No. 3:15-CV-0600-D, 2017 WL 2599120, at *1 (N.D. Tex. June 15, 2017). "In determining whether the movant has met its burden under Rule 16(b)(4), the court considers four factors: (1) the party's explanation, (2) the importance of the

requested relief, (3) potential prejudice in granting the relief, and (4) the availability of a continuance to cure such prejudice." *Id.* at *2. Courts generally consider these same four factors to determine whether the standard is met for motions for a continuance. *See, e.g.*, *Morin v. Chevron U.S.A., Inc.*, No. CIV.A. 11-0045 G (3), 2012 WL 38384, at *4 (E.D. La. Jan. 9, 2012).

"District courts have 'broad discretion' in deciding motions for continuances." *Myers v. CitiMortgage, Inc.*, 557 F. App'x 296, 298 (5th Cir. 2014). The Fifth Circuit has held that a continuance is appropriate where "the denial of the motion … severely prejudiced the [movant]," and where, "on balance, the interests in favor of a fair trial heavily outweighed the interests in favor of an immediate trial." *Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co.*, 423 F.2d 842, 843–44 (5th Cir. 1970) (reversing denial of continuance grounded on counsel's unavailability at trial due to illness); *Myers*, 557 F. App'x at 298 (emphasis original) ("We will *not* substitute our judgment concerning the necessity of a continuance for that of the district court, unless the complaining party demonstrates that it was prejudiced by the denial."); *accord Hill v. Ozmint*, 339 F.3d 187, 196–97 (4th Cir. 2003) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)) (discussing necessity for granting a continuance when faced with "a justifiable request for delay").

The Fifth Circuit's recent decision in *In re: Timothy Bernard Tanner*, Case No. 20-10510, Doc. 00515434019 (5th Cir. May 29, 2020), did not abrogate these principles and does not prohibit this Court from exercising its broad discretion to grant a trial continuance in this case. The *Tanner* court held only that the criminal defendant failed to meet the "much higher" standard for mandamus review,[9] and that "the circumstances of th[at] case [fell] outside the highly-limited

---

[9] The standard for mandamus review is "clear abuse of discretion" as opposed to "mere abuse of discretion" for normal appellate review. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 309-10 (5th Cir. 2008). The standard is much higher because writs of mandamus are "an extraordinary remedy," *id.* at 311, reserved for "exceptional circumstances." *Id.* at 309 (citation omitted). Among other things, the "petitioner must show that its right to issuance of the writ is clear and indisputable

parameters of appellate grants of mandamus and prohibition petitions." *In re: Tanner*, Doc. 00515434019 at 2. Indeed, the Fifth Circuit acknowledged that the criminal defendant had made "good arguments why the trial should not proceed as scheduled," but they could not substitute their judgment concerning the necessity for a continuance because of the heightened standard. *Id.*

As discussed below, the circumstances of this case are materially different from those in *Tanner* and warrant a continuance. The state of the pandemic has significantly worsened since that early June trial; the massive surge in Texas cases occurred after this 3-day trial. *See* Texas COVID-19 Data: County Trends, Appx. at 1-9. This has had a material impact on the ability to impanel an impartial jury from a fair cross section of the community as certain demographics have been hammered by the virus since early June and others are unable or unwilling to serve. The criminal defendant in *Tanner* was also not faced with the disproportionate witness and counsel availability issues presented here. All of the witnesses and counsel in *Tanner* were local and could appear in-person. None of them faced the risks of traveling to Dallas from all across the country, or the burdens from mandatory quarantines upon return home, that Bard's witnesses and counsel face.

In sum, the circumstances of holding a December trial in Dallas, Texas during the COVID-19 pandemic, amid the safety restrictions that this Court has reasonably deemed necessary to protect public health, will unfairly and disproportionately be borne by Bard, will severely prejudice Bard's rights to due process, and will deny Bard a full and fair trial by an impartial jury selected from a fair-cross section of the community. Proceeding with trial under these circumstances would "elevate judicial expedience over considerations of justice and fair play." *Hardy v. Johns-Manville*

---

by demonstrating that there has been a usurpation of judicial power or a clear abuse of discretion." *Id.* at 311 (citations and quotations omitted). The criminal defendant in *Tanner* failed to make this showing, or a showing necessary for a supervisory writ of mandamus, and the petition was denied. Notably, the Fifth Circuit did not address the separate interlocutory appeal on the district court's denial of the motion for continuance, which the criminal defendant later voluntarily dismissed.

*Sales Corp.*, 681 F.2d 334, 348 (5th Cir. 1982). This is especially true where Plaintiff can show no prejudice by a continuance, because a trial continuance is available and will cure any potential prejudice a brief delay would cause. Because "the interests in favor of a fair trial heavily outweigh[] the interests in favor of an immediate trial," Bard respectfully submits that good cause exists to continue this trial until February/March 2021. *Smith-Weik Mach. Corp.*, 423 F.2d at 844.

**A.      A Continuance is Important and Necessary to Protect Bard's Due Process Rights and to Ensure a Full and Fair Trial Conducted with Fundamental Fairness.**

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (citation omitted). "[F]airness in a jury trial, whether criminal or civil in nature, is a *vital* constitutional right." *Latiolais v. Whitley*, 93 F.3d 205, 207 (5th Cir. 1996) (citation omitted and emphasis added). "A litigant has a due process right to a 'full and fair opportunity to litigate an issue.'" *Hardy*, 681 F.2d at 338 (citation omitted); *duPont v. S. Nat. Bank of Houston, Tex.*, 771 F.2d 874, 880 (5th Cir. 1985) ("[A]ppellants have a due process right to fully and fairly litigate each issue in their case."). Due process mandates "an opportunity to be heard on the allegations asserted in the complaint and to present evidence and argument on the contested facts and legal issues framed by the answer." *Thompson v. Madison Cty. Bd. of Ed.*, 476 F.2d 676, 678 (5th Cir. 1973). "[A] court can only render a judgment after the parties have been afforded a *full and fair trial* on the claims properly before the court." *Id.* (emphasis added). "The ultimate test of procedural due process is whether the trial was conducted with 'fundamental fairness'." *Beck v. QuikTrip Corp.*, 708 F.2d 532, 536 (10th Cir. 1983).

**1.      Bard's witnesses are likely unable to appear in-person at trial.**

This is a complex, medical device case involving a significant number of trial witnesses, both fact and expert witnesses. At this time, Bard expects Plaintiff to call at least 17 witnesses live

at trial, and Bard intends to call up to 13 witnesses live.[10] The vast majority of Plaintiff's witnesses are local, residing in and around Dallas. ***None*** of Bard's witnesses reside in Texas. Thus, unlike Plaintiffs' witnesses who can travel to the courthouse from their nearby homes with relative safety to appear in-person, ***all*** of Bard's witnesses would be required to travel from out-of-state to Texas at a time when interstate travel (especially by plane) poses significant health and safety risks and post-travel burdens, and at a time when Texas is leading the nation in COVID-19 cases behind only California. *See infra*, Section II.B (discussing health and safety risks). These safety risks and burdens will be more heavily borne by Bard's witnesses and will have a significant impact on witness availability. The result will deprive Bard of its due process right to a "full and fair trial."

Unlike most of Plaintiffs' witnesses, ***all*** of Bard's witnesses will have to decide among (a) facing the significant health and safety risks in traveling by plane, (b) traveling long-distance by car (a thousand-plus miles from Arizona, California, Maryland, Massachusetts, Pennsylvania, or Vermont), or (c) not appearing in-person at all. Each witness will have to consider their personal circumstances: their risk-factors for contracting COVID-19, the burdens already imposed by COVID-19, the risks to their families and local communities, and, for some, the impact of travel and resulting lengthy quarantines on their role as essential healthcare providers. Given the difficult choice, Bard believes that it is likely that for personal, occupational, or safety reasons, most of its witnesses would be unavailable to appear in-person in December.

As an initial matter, most of Bard's fact witnesses reside in Phoenix, Arizona, which is also experiencing a surge in COVID-19 cases, making travel by these witnesses to Texas a higher risk

---

[10] Because the parties have yet to exchange witness lists in advance of the Court's deadline, it is unclear which witnesses Plaintiff intends to call live. Given the number of local treating physicians identified by Plaintiff in her disclosures, however, Bard anticipates the number of live witnesses to be at or more than those identified in the witness lists exchanged in *Sweezey*. *See* Rule 26(a)(1) Disclosures, Appx. at 114-182. Both parties also intend to play a number of video depositions.

to everyone they encounter during their travel as well as to all trial participants. Additionally, unlike all but two of Plaintiff's witnesses, many of Bard's witnesses reside in states that impose mandatory quarantines on out-of-state travel from Texas:[11]

- Dr. Clement Grassi and Dr. Piotr Sobieszczyk reside and practice in Massachusetts, which requires travelers to complete a Massachusetts Travel Form and "[q]uarantine for 14 days or produce a negative COVID-19 test result that has been administered up to 72-hours prior to your arrival in Massachusetts"—"Failure to comply may result in a $500 fine per day."[12] Massachusetts's mandatory quarantine requirements are detailed and extensive. Dr. Sobieszczyk testified live in the MDL bellwether trial where he was identified as an expert, and is one of Bard's case-specific medical experts in the *Wright* case. Dr. Grassi is one of Bard's generic medical experts and has testified live in every prior Bard IVC filter trial.

- Dr. Christopher Morris resides and practices in Vermont, which requires travelers to complete either a 14-day quarantine or a 7-day quarantine followed by a negative PCR test; Vermont's mandatory quarantine would prohibit him from "doing any activities outside of the home, like grocery shopping or getting together with friends or family."[13]

---

[11] Although Bard's other witnesses reside in Arizona, California, or Pennsylvania, which do not impose mandatory quarantine for out-of-state travelers, these witnesses still face significant health risks in traveling to Texas not faced by most of Plaintiff's witnesses. For example, Dr. David Poll, one of Bard's case-specific medical experts in the *Wright* case, is under doctor's orders not to travel because of a medical condition that puts him in a higher risk category in addition to his age. Dr. Poll is a clinical cardiologist with a busy practice that he is managing by telemedicine during the pandemic because of his risk category. Dr. Poll also resides and practices in Pennsylvania, which recommends (but does not mandate) a 14-day quarantine for travelers returning from Texas.
[12] *See* Massachusetts Dept. of Public Health, Covid-19 Travel Order (Aug. 1, 2020), https://www.mass.gov/info-details/covid-19-travel-order (last visited Oct. 11, 2020).
[13] *See* Vermont Dept. of Health, Traveling to Vermont (Oct. 11, 2020), https://www.healthvermont.gov/response/coronavirus-covid-19/traveling-vermont.

Dr. Morris testified live in the two MDL bellwether trials where he was retained as an expert and is one of Bard's case-specific medical experts in the *Wright* case.

- Dr. Donna-Bea Tillman resides and works in Maryland, which requires travelers to "get tested and self-quarantine at home until the test result is received"—the test must be obtained upon arrival or within 72 hours before travel to Maryland.[14] Dr. Tillman is one of Bard's generic experts and testified live in all three of the MDL bellwether trials.

Thus, many of Bard's expert witnesses will be forced to weigh the safety risks of testifying in-person at trial for a day or two with the further burden of a mandatory two-week quarantine on their return home—a decision only two of Plaintiff's witnesses will have to face. This disproportionate burden is a heavy one. For example, as with many of the parties' medical experts, Drs. Grassi, Morris, Poll, and Sobieszczyk are busy practicing physicians. They cannot be expected to abandon their medical practices for more than two-weeks to travel to and testify in a civil trial. The disproportionate burden on Bard is further exacerbated because it is unclear whether the December trial will begin as early as December 3rd or on December 7, 2020 as currently set. As a result, none of Bard's witnesses are able to plan with certainty when they will be required to travel to Texas, and none of them know when they will be forced to self-quarantine for two weeks when they return home. While scheduling challenges are typical in complex multi-week trials, the impact of COVID-19 travel advisories adds significant further complications on Bard's witnesses.

Under the circumstances, proceeding to trial in December will likely mean that most of Bard's witnesses will be unavailable to testify in-person, whereas Plaintiff's witnesses residing in the Dallas metropolitan area will not face such significant risks or burden. Bard is concerned the

---

[14] *See* Maryland Dept. of Health, Notice – Out of State Travel and Public Travel Advisory (July 29, 2020), https://phpa.health.maryland.gov/Documents/07.29.2020%20-%20MDH%20Notice%20-%20Out%20of%20State%20Travel%20Advisory.pdf (last visited Oct. 11, 2020).

optics of such a trial – where one side has witness after witness appear in person to testify live and

the other side has no practicable option but to present evidence via video or deposition transcript

– will result in significant prejudice to it. Such a trial would be so lacking in "fundamental

fairness," that it would deprive Bard of a full and fair trial and its right to "procedural due process,"

essentially putting a thumb in Plaintiff's favor on the scales of justice. *Beck*, 708 F.2d at 536.

### 2.        Remote testimony is an inadequate substitute under the circumstances.

Because most of Bard's witnesses are unlikely to be available for in-person testimony, the

closest substitute to presenting Bard's witnesses live at trial is via remote means. *See* Fed. R. Civ.

P. 43(a). Bard believes that "good cause" and "compelling circumstances," as required by Rule

43(a), exist to warrant remote testimony should the case proceed to trial in December. *Id.* But such

a substitute would be inadequate in this case to protect Bard's due process rights to "fully and

fairly litigate each issue in their case." *duPont*, 771 F.2d at 880. "The fundamental requirement of

due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Requiring Bard to proceed to trial where most of

its live testimony would have to be via remote videoconference, compared to Plaintiff's witnesses

who will be able to appear in-person, would not ensure a fundamentally fair trial.

*First*, there is a well-recognized preference for live in-person testimony. "The importance

of presenting live testimony in court cannot be forgotten." Fed. R. Civ. P. 43, advisory committee's

note (1996). "Clearly, a jury trial conducted by videoconference is not the same as a trial where

the witnesses testify in the same room as the jury." *Thornton v. Snyder*, 428 F.3d 690, 697 (7th

Cir. 2005). This is because certain features useful to assessing credibility and persuasiveness, such

as "[t]he immediacy of a living person is lost" with video technology and "the ability to observe

demeanor, central to the fact-finding process, may be lessened." *Id.* (citations omitted). "This may

be particularly detrimental where it is ***a party to the case*** who is participating by video

- 11 -

conferencing, since personal impression may be a crucial factor in persuasion." *Id.* (citation omitted and emphasis added). "[E]ven with the benefits that technology provides, substitutes for live testimony are necessarily imperfect." *Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 479 (D. Md. 2010). "[I]t seems obvious that remote transmission [of testimony] is to be the exception and not the rule," *id.*, because "virtual reality is rarely a substitute for actual presence ... even in an age of advancing technology." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001).

*Second*, much of Bard's live testimony concerns complex, technical subject matter. Requiring most of its witnesses, including its experts, to testify by videoconference will hinder Bard's ability to convey this complicated testimony in a clear and comprehensible manner to the jury. "A trial is a proceeding designed to be a search for the truth." *Sims*, 77 F.3d at 849. "When the manner of the presentation of information to a jury is judicially restricted to the extent that the information becomes incomprehensible then the essence of the trial itself has been destroyed." *Id.*

*Third*, where the parties' respective presentation of evidence will be so different – with Plaintiff presenting many witnesses in person and Bard presenting most of its witnesses via video or deposition – the inherent preference for live, in-person testimony results in the significant risk of unfairly prejudicing Bard and depriving it of due process. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-LPS-CJB, 2020 WL 3605623, at *2 (D. Del. July 2, 2020) (Stark, C.J.) ("It is clear that not all of the witnesses can safely travel to Delaware and testify in person. The Court is concerned that unless all witnesses can do so, there is a risk of unfair prejudice to the side which has more witnesses who end up being unable to come to the courtroom[, which] could disproportionately affect one side or the other."). The parties in *Sunoco Partners* identified only three witnesses unable to travel for trial—two plaintiff and one defense witness. *Id.* This same concern is insurmountable here, where the optics would be so one-

- 12 -

sided. Having most of Bard's witnesses testify remotely will leave jurors with the misimpression that Bard did not believe the case was important enough to merit in-person testimony. That is manifestly unfair in a case where Plaintiff is likely to demand over $1 billion in damages.

Bard would be at a disadvantage in this trial from the very outset, forced to suffer all of the shortcomings, imperfections, and technical glitches inherent in using remote technology, along with any adverse juror credibility evaluations, for most of it live witnesses while Plaintiff would avoid these shortcomings simply because of the fortuity of her local forum. That is not fundamental fairness. Thus, if the Court were inclined to proceed to trial, Bard requests that no witnesses be permitted to testify in the courtroom to even the playing field. *See id.* (proceeding to trial but excluding all witnesses from testifying in-person, which "will also make it much easier to maintain social distancing in the courtroom and protect the health of those in the courtroom").

***Finally***, it is unclear at this time what the "appropriate safeguards" necessary to permit remote testimony would be for this trial. *See* Fed. R. Civ. P. 43(a) ("For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."). Whatever safeguards are imposed, it is clear that Bard would be forced to bear a significantly heavier cost and burden in presenting its live testimony than Plaintiff. For example, if the Court were to follow Judge Campbell's approach in the final MDL bellwether case, then Bard would need to be prepared to:

(1)  Coordinate with the local federal district courts for each of its witnesses in six different states to arrange for video testimony during trial from those federal courthouses—and, given local restrictions as a result of the pandemic, there is no guarantee that the witnesses would be able to testify in these courthouses;

(2)  Should the above method to ensure appropriate safeguards be employed here, each of

- 13 -

Bard's approximate 13 "live" witnesses would be required to travel to their local federal district court and testify "alone in a room with a videographer and courtroom deputy clerk at the time of [their] testimony, although counsel for both sides may be in the courthouse to deal with any issues that arise" concerning outside influence on their testimony—which would leave both parties in the unenviable position of having to weigh the risks of having counsel travel to these six different states against the risks of outside influence should the witnesses remain unaccompanied;[15]

(3) The parties will have to confer in advance about exhibits to be used (even if pre-admitted) during the witnesses' testimony, and provide a complete set of marked exhibits for the various clerks to place in front of the witnesses during their testimony;

(4) Bard will be required to pay the costs associated with the remote testimony; and

(5) The parties will need to confer and propose a jury instruction to be read during trial to explain the witnesses' absence from trial and the reasons for the remote testimony.

*See* CMO No. 42, *In re: Bard IVC Filters Prods. Liab. Litig.*, Case 2:15-md-02641-DGC, Doc. 16343, at 1-2 (D. Ariz. Mar. 21, 2019), filed in this case at [ECF No. 8-1, at 326-327].

For these reasons and under these unique circumstances, remote testimony would be an inadequate substitute that would disproportionately burden and severely prejudice Bard. This case is one of many similarly situated cases across the country. The verdict, whatever it shall be, will likely have ramifications beyond this case. A verdict rendered under these circumstances would be so lacking in fundamental fairness as to deprive Bard of its right to due process and a fair trial.

---

[15] Bard's trial counsel will also be "forced to choose between being in the same room as [its] client [witnesses] and thus not in the same room as the judge and jury, or remaining in the courtroom with the judge and jury and thus unable to confer in person with his client [witnesses]." *Thornton*, 428 F.3d at 699; *Rusu v. U.S. I.N.S.*, 296 F.3d 316, 326 (4th Cir. 2002) (discussing "Catch 22").

- 14 -

### 3.    The dangers and burdens from travel singularly impact Bard's counsel.

The burdens and dangers of a December trial are also unfairly and disproportionately borne by Bard's trial counsel. All of Plaintiff's trial counsel reside in Dallas. With the exception of Ms. Matthews, none of Bard's trial attorneys reside in Texas. Thus, like all of its witnesses, Bard's trial counsel will have to travel from out-of-town and face the significant health and safety risks posed by interstate travel to Texas during its expected resurgence in COVID-19 cases following Halloween and Election Day (which is expected to have record turnout). Nearly all of Bard's trial attorneys reside in Atlanta, Georgia and will have to travel from Hartsfield-Jackson Int'l Airport, the perennial "world's busiest airport,"[16] to DFW Int'l Airport, "the world's busiest airport during COVID-19."[17] Over 1,000 TSA agents recently tested positive for the virus.[18] Thus, the risk that one or more of Bard's attorneys contracts COVID-19 through these busy travel hubs is very real.

To avoid the serious risks from travel to and from Dallas, Bard's trial attorneys would be required to in-effect sequester in Dallas in advance of and throughout the trial. No similar burden would be faced by Plaintiff's trial counsel who are all Dallas-based attorneys and who are free to go about their daily lives in advance of and during the trial. This is especially concerning because during each of the past Bard IVC filter trials, either in the MDL or before, Bard has had a minimum of five attorneys from the Nelson Mullins firm present at trial, and at times up to nine. Not all of these attorneys were present for the entirety of the past trials as their roles were witness-dependent.

---

[16] *See* Alex Gailey, *Decade of Growth: Hartsfield-Jackson remains world's busiest airport*, ATLANTA BUS. CHRONICLE (Mar. 27, 2020 10:06 AM), https://www.bizjournals.com/atlanta/news/2020/03/27/hartsfield-jackson-remains-world-s-busiest-airport.html.

[17] *See* Kyle Arnold, *DFW becomes the world's busiest airport during COVID-19 downturn*, THE DALLAS MORNING NEWS (June 4, 2020 3:58 PM), https://www.dallasnews.com/business/airlines/2020/06/04/dfw-becomes-the-worlds-busiest-airport-during-covid-19-downturn/.

[18] *See* Ian Duncan, *More than 1,000 TSA employees have tested positive for coronavirus*, WASH. POST. (July 9, 2020), https://www.washingtonpost.com/transportation/2020/07/09/more-than-1000-tsa-employees-have-tested-positive-coronavirus.

Likewise, Bard's client representatives—Greg Dadika (Senior Vice President, Chief Litigation Counsel) and Candace Camarata (Associate General Counsel)—attended the MDL bellwether trials; and Bard has had counsel present at every trial it has been involved in over the past decade.

Yet because of the safety risks from the travel conditions, which *only* impact Bard, all of these attorneys will have to spend nearly a month in Dallas for the trial. None of Bard's counsel will be able to leave Dallas during this period to travel home to visit with or care for family over weekend breaks without exposing themselves along the way to the very real risk of contracting COVID-19 and spreading the virus within their communities or bringing it back to the courtroom. It is not unlikely that some of Bard's counsel would be forced to forego assisting at trial due to an inability to be absent for such an onerous period. This situation is made worse by the potential that Bard's trial counsel may contract the virus shortly before or even during the trial despite taking all safety precautions and sequestering in Dallas. In that event, Bard will be left with a depleted bullpen of quarantined counsel to call on for relief.

A December trial is also especially onerous for Bard's client representatives Mr. Dadika and Ms. Camarata who live in New Jersey and New York, respectively. Pursuant to their respective home states' travel restrictions,[19] Mr. Dadika and Ms. Camarata would be required to quarantine for two-weeks upon return from Texas. Faced with such a lengthy burden—which none of Plaintiff's counsel face—Bard may be looking at the first trial in decades without a representative

---

[19] *See* New York State Dept. of Health, COVID-19 Travel Advisory (Oct. 10, 2020) https://coronavirus.health.ny.gov/covid-19-travel-advisory (last visited Oct. 11, 2020) (imposing mandatory 14-day quarantine); New Jersey Dept. of Health, *Which states are on the travel advisory list? Are there travel restrictions to or from New Jersey?* (Sept. 29, 2020) https://covid19.nj.gov/faqs/nj-information/travel-information/which-states-are-on-the-travel-advisory-list-are-there-travel-restrictions-to-or-from-new-jersey (last visited Oct. 11, 2020) (emphasis original) (advising travelers to self-quarantine for 14 days regardless of negative testing and "only leave … to seek medical care/treatment or to obtain food and other essential items"; though the self-quarantine is voluntary, "**compliance is expected**").

in attendance. The disproportionate burden and dangers of a December trial on Bard's counsel, along with the singular impact of attendant mandatory quarantines, is far from fundamentally fair.

**4.      The Court's COVID-19 limitations will undermine a full and fair trial.**

Chief Judge Lynn's Coronavirus Trial Handbook, which Bard believes the Court intends to implement for the December trial, prohibits "bench conferences." *See id.* at 10, Appx. at 53. If sidebar discussions become necessary, the jury will have to be excused to address the issue or counsel will need to email the Court. *Id.* Bard is concerned that this limitation will seriously undermine Bard's due process right to a full and fair trial. Unlike Judge Lynn's 3-day trial in *Tanner* that saw "few instances" of sidebar, *id.*, there were a considerable number of sidebars during the MDL bellwether trials; and Bard anticipates as many or more in this case given the up to 27 motions *in limine* the parties expect to file. Because Bard anticipates that some or many of these motions may not be granted, or the Court may reserve ruling until time of trial, it is reasonable to expect that the parties will have a significant number of disagreements over admissibility of certain evidence as the trial unfolds. Indeed, certain motions are expected to be re-urged at trial as the evidence plays out for record preservation regardless of pretrial rulings. These objections and motions are not amenable to argument and resolution via email. Therefore, the jury will likely need to be excused a considerable number of times throughout the trial to address evidentiary rulings. Under these circumstances, and given the ambitious two-week trial estimate,[20] Bard may be reluctant to raise arguments or re-urge motions it otherwise would absent this trial limitation for fear of inconveniencing the jury and inviting their ire and prejudice.

Additionally, the Court instructed that all trial participants would be required to wear masks (with the option of also wearing a face shield) except witnesses when testifying. But Bard's counsel

---

[20] Bard notes the first MDL bellwether trial took 27 hours for Bard and 30 hours for the plaintiffs.

is concerned that wearing a mask (as opposed to just a face shield) during witness examination and the presentation of its case will have a negative impact on the jury, as it could impair their ability to understand counsel and to assess their credibility,[21] which is so dependent on being able to see counsel's face. *See* Coronavirus Tr. Handbook, at 10, Appx. at 53 ("At least one juror felt it was difficult to understand some of the attorneys because of their masks and preferred to see the attorneys' faces."). "A trial is a proceeding designed to be a search for the truth" and "[e]ssential to the endeavor is an opportunity for the parties through their lawyers to present information in a manner that is comprehensible to a judge or jury." *Sims*, 77 F.3d at 849. "When the manner of the presentation of information to a jury is judicially restricted to the extent that the information becomes incomprehensible then the essence of the trial itself has been destroyed." *Id.*

### 5. The COVID-19 pandemic jeopardizes the ability to impanel an impartial jury from a fair cross-section of the community.

"The Constitution guarantees both criminal and civil litigants a right to an impartial jury." *Warger v. Shauers*, 574 U.S. 40, 50 (2014). This fundamental right is also enshrined in Article I § 15 of the Texas Constitution. *See Doucet v. Owens-Corning Fiberglas Corp.*, 966 S.W.2d 161, 163 (Tex. Ct. App. 1998) (this section "refer[s] not only to the right of trial by jury, but also to the purity of the jury, embrac[ing] the fundamental principles of impartiality and freedom from bias."). The Constitution further guarantees the right to an impartial jury "selected from a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 359 (1979); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946) ("The tradition of trial by an impartial jury drawn from a cross-section of the community applies to both civil and criminal proceedings."); *Timmel v. Phillips*, 799 F.2d 1083, 1086 n.5 (5th Cir. 1986) ("assum[ing], without deciding, that the fair cross-section

---

[21] *See* Jill Leibold, et al., *COVID-19 And Design Defect Jurors' Risk Evaluations: Part 3*, LAW360 (July 30, 2020 4:41 PM), https://www.law360.com/articles/1295442/print?section=lifesciences ("64% of those surveyed would find attorneys less credible if they wore a mask at trial.").

requirement is similarly required by the Constitution in civil cases"); *accord Williams v. City of Cleveland*, 848 F. Supp. 2d 646, 658 (N.D. Miss. 2012); *McGinnis v. M. I. Harris, Inc.*, 486 F. Supp. 750, 755 (N.D. Tex. 1980). The right to a fair-cross section in federal civil cases is also codified in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 ("[A]ll litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."). Finally, the Equal Protection Clause protects against substantial underrepresentation of persons of an identifiable group from juries. *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

In light of the significant impact COVID-19 continues to have on the residents of the Dallas division (residents of Dallas, Ellis, Hunt, Johnson, Kaufman, Navarro, and Rockwall counties), *see infra*, Section II.B, Bard is concerned that any jury venire drawn in December would not be from a "fair cross section of the community" and may not produce an impartial jury. Bard is specifically concerned that the venire will lack racial diversity stemming from substantial underrepresentation of African-American and Hispanic jurors whose communities have been hit the hardest by the virus,[22] as well as diversity in age, gender, and political affiliation.[23]

According to a National Center for State Courts ("NCSC") Texas Juror Poll of 850 eligible jurors conducted between June 8-11, 2020, 34% of Texans indicated they would definitely or

---

[22] *See* Dr. Feigal Decl. at ¶ 25, Appx. at 195; *see also* Jordan Bontke, *Dr. Fauci talks "stunning" COVID-19 trends in Hispanic Texas communities*, CBS AUSTIN (Sept. 24, 2020), https://cbsaustin.com/news/local/fauci-talks-stunning-covid-19-trends-in-hispanic-texas-communities ("Latino community makes up more than half the COVID-19 deaths in Texas."); ShaCamree Gowdy, *New tallying method further confirms that COVID-19 is deadlier for Black and Hispanic people*, HOUSTON CHRONICLE (July 31, 2020 7:58 AM), https://www.chron.com/coronavirus/article/New-tallying-method-further-confirms-that-15447002.php.

[23] Mark Curriden, *Harris County juries projected to be whiter, more conservative as pandemic persists*, HOUSTON CHRONICLE (July 3, 2020 5:49 PM), https://www.houstonchronicle.com/business/article/harris-county-jury-white-male-conservative-covid-15380341.php.

probably not appear for jury duty if summoned in the next three months. *See* NCSC Texas Juror Poll, at Figs. 19-20 (June 24, 2020), Appx. at 28-29. Similarly, a survey conducted by the Tillotson Law Firm of 650 potential jurors in Houston and Dallas between June 6-12, 2020, "found that more than two-thirds said they either would refuse to show up for jury duty if called or would want a significant amount of assurance that their personal health would not be at risk before they would agree to attend;" 19% of Dallas respondents "felt that there were 'no measures' that could be taken that would make them feel safe."[24] Likewise, 26% of NCSC respondents would definitely or probably not appear even with safety measures. *See id.*, at Fig. 23, Appx. at 32. Both surveys pre-date[25] the surge in COVID-19 cases experienced over the past few months,[26] and Bard anticipates these numbers are even higher under the current conditions. In fact, this Court reported that a recent 1-2 day jury trial in the Dallas division saw a less than 50% response rate to jury summons and had several potential jurors respond but not show up for jury selection. As this Court acknowledged, the response rate for this ambitious two-week trial would likely be even worse. Indeed, the Court was hopeful that it could seat a 27 person venire out of 150 questionnaires (18%) for this trial but expressed doubt given the District's and division's experience from recent trials.

The NCSC survey results also showed that women, older individuals, and people of color are more likely to anticipate obstacles to reporting to jury service as a result of the pandemic, and are less likely to appear. *See id.*, at Figs. 9, 20, Appx. at 18, 29.[27] For example, the Tillotson survey

---

[24] *Id.* (emphasis added).

[25] Both surveys were conducted after the *Tanner* venire that had a smaller sample size (99 potential jurors) and resulted in an 80% response rate. *Cf.* Coronavirus Tr. Handbook, at 1, Appx. at 44.

[26] *See* Katie Pohlman, *Texas Attorneys, Jurors Want Temp. Checks, Masks in Court*, LAW360 (June 24, 2020 7:57 PM), https://www.law360.com/articles/1286467/texas-attorneys-jurors-want-temp-checks-masks-in-court ("[T]he survey answers should be viewed in context since both were completed before Texas started reporting record-high numbers of daily confirmed cases and hospitalizations since reopening efforts began.").

[27] These obstacles include concerns because someone in their household has an underlying health

found African-American and Hispanic respondents from Dallas and Houston were 30% more likely to qualify for a COVID-19 jury duty exception than white respondents.[28] The NCSC survey also found that 39% of Texans are not comfortable with jury activities or going to a government building. *See id.*, at Fig. 11, Appx. at 20. This figure is consistent with the 40% of Dallas respondents who are concerned that the courthouse is unsafe, and 36% who would be "very angry if called for a jury trial at this time."[29] Most concerning, however, is that the individuals least comfortable participating in in-person court activities are liberals (66%), African-Americans (56%), college educated women (49%), older women (47%), and seniors (47%). *Id.*

Bard is concerned, based on this data, that substantial diversity will be washed out of the jury panel summoned for this case. Indeed, this Court has already indicated that it would excuse any prospective juror who wants to be dismissed because of COVID-19 concerns.[30] The jury pool that would remain would substantially underrepresent the community and may be less than impartial to the parties in this case. For example, those jurors who remain because they have little or no concern about COVID-19 may be less inclined to trust science-based evidence, especially evidence related to federal agencies like the Food and Drug Administration.[31] "Jurors' trust in

---

condition (45%), they are the primary caregiver to an elderly family member (14%), or they could not secure childcare (12%). *See* NCSC Texas Juror Poll, at Figs. 20, Appx. at 29. Bard anticipates that these figures are even higher now that schools have opened as even more potential jurors will likely struggle to secure childcare.

[28] *See* Mark Curriden, *Harris County juries projected to be whiter, more conservative as pandemic persists*, HOUSTON CHRONICLE (July 3, 2020 5:49 PM), https://www.houstonchronicle.com/business/article/harris-county-jury-white-male-conservative-covid-15380341.php.

[29] *Id.*

[30] Out of the 99 potential jurors receiving jury questionnaires in Judge Lynn's *Tanner* jury panel, only 48 potential jurors remained from those who had responded to the summons once excuses were granted for COVID-19. *See* Coronavirus Tr. Handbook, at 2, Appx. at 45.

[31] *See* Jill Leibold, et al., *COVID-19 And Design Defect Jurors' Risk Evaluations: Part 3*, LAW360 (July 30, 2020 4:41 PM), https://www.law360.com/articles/1295442/print?section=lifesciences (observing post-pandemic trust in science is declining and "traditionally credible evidence may be considered less so in light of the lessons of the pandemic," especially "when considering evidence

government agencies matters in design defect cases – particularly in complex product liability cases, and especially with regulated industries," like medical devices.[32] Equally concerning in this complex medical device case is that healthcare workers are more likely to be excused from jury service because of COVID-19 when they might not otherwise absent the pandemic. *See* Coronavirus Tr. Handbook, at 13, Appx. at 56 (Ability to Participate in Jury Service Form). Therefore, proceeding to trial in December would deprive the parties of an impartial jury selected from a fair cross section of the community.[33]

*    *    *

For these reasons, a "denial of a continuance" under these circumstances would severely prejudice Bard, would deprive Bard of a fair trial by an impartial jury selected from a fair-cross section of the community, and would be "so arbitrary as to violate due process." *Ungar*, 376 U.S. at 589. Because "the interests in favor of a fair trial heavily outweigh[] the interests in favor of an immediate trial," the Court should grant Bard's Motion. *Smith-Weik Mach. Corp.*, 423 F.2d at 844.

**B.    A Continuance is Important and Necessary to Protect the Health and Safety of Trial Participants and Their Local Communities.**

In these extraordinary times, "the Court must weigh, not only the interests of the parties and the Court in conducting this trial, but also the greater public interest in minimizing the spread of coronavirus. The public interest requires that this civil trial … be continued." *Quinn v. City of*

---

from the FDA"); Jill Leibold, et al., *COVID-19 And Design Defect Jurors' Risk Evaluations: Part 2*, LAW360 (July 29, 2020 5:58 PM), https://www.law360.com/articles/1295440/print?section= lifesciences (observing post-pandemic shift in trust of federal agencies, including FDA; "Democratic potential jurors view[] federal agencies slightly more positively than Republican potential jurors.").

[32] *Id.*

[33] Even if a constitutionally adequate jury could be seated—and Bard is concerned one could not be seated—this Court acknowledged there is a very real risk that one or more jurors would leave during the middle of the two week trial, which would require a recess for an indeterminate time period (as occurred in a recent bankruptcy trial) and would result in a mistrial if they did not return.

- 22 -

*Tuskegee, Alabama*, No. 3:14-CV-1033-ALB, 2020 WL 2846662, at \*1 (M.D. Ala. June 1, 2020) (granting last-minute continuance *sua sponte* in light of resurgence of COVID-19 cases). Just like the *Quinn* court found in Alabama, Texas's "incidences of coronavirus are getting worse, which makes it more likely that a trial—a large indoor gathering that last several days—will spread the coronavirus to a large number of people." *Id.* In contrast with the 3-day *Tanner* criminal trial that Judge Lynn held in early June,[34] and her later 1-2 day criminal trial, the situation has materially worsened. The seven counties that constitute the Dallas division (Dallas, Ellis, Hunt, Johnson, Kaufman, Navarro, and Rockwall) experienced a surge of coronavirus cases since that time. While that trend decreased in recent months, it is now going in the "wrong direction" again with a resurgence expected following Halloween and Election Day. *See* Texas COVID-19 Data: County Trends, Appx. at 1-9. And the risk of contracting COVID-19 in a two-week Dallas trial setting has never abated. Dallas County where this Court is located in particular has been hit hardest out of these counties. It ranks second in the state for active cases with nearly twice the number reported by the third-ranked county. Just over the last week, Dallas County has averaged more than 410 new cases per day. *See* Dr. Feigal Decl. at ¶ 10, Appx. at 188. Moreover, Dallas County's rate of death from COVID-19 is among the highest in the State of Texas and the nation. *Id.*

Additionally, the risk that an infected person will be at the December trial is not speculative. This Court has indicated that on the first day of trial at least 27 prospective jurors will

---

[34] Judge Lynn has acknowledged that her brief *Tanner* trial demanded "extraordinary exhaustion of resources to have a trial under these circumstances. I used three courtrooms. We spent significant money purchasing supplies, and it will become more and more challenging when we have a trial, with multiple defendants, multiple counts, and greater length." Angela Morris, *Chief Judge Barbara Lynn Reflects on Pros, Cons of First Jury Trial Amid COVID-19*, TEXAS LAWYER (June 9, 2020 2:13 PM), https://www.law.com/texaslawyer/2020/06/09/chief-judge-barbara-lynn-reflects-on-pros-cons-of-first-jury-trial-amid-covid-19/?slreturn=20200704121600.    That    is precisely the challenge this Court faces with a December trial in this case.

be brought to the courthouse for this trial. But the jury panel for this case will not be alone. The Court, its staff, and federal marshals, as well as the parties' attorneys, support staff, and client representatives (potentially) will also be present. It is not unreasonable to expect that the amount of participants gathered indoors for the first day of trial may reach more than 50.[35] A risk assessment tool created by Georgia Tech shows that, in Dallas County, there is a 49% likelihood of at least one person having the virus in a gathering of this size. *See* Dr. Feigal Decl. at ¶ 11, Appx. at 189. In the June 1st *Tanner* venire "three jurors called in sick on the day of jury selection, and [one] had a fever." *See* Coronavirus Tr. Handbook, at 2, Appx. at 45. Bard also expects Plaintiff intends to call at least 17 live witnesses at trial, most of whom are local but some of whom will have recently traveled to Texas. Bard is concerned that these "witnesses may feel pressure to conceal symptoms and/or coronavirus-related concerns and come to Court when it would be best if they did not." *Sunoco Partners*, 2020 WL 3605623, at *2. Because conditions show little sign of improving, it is a virtual certainty that someone with COVID-19 will be at the trial.

Thus, proceeding with a December trial creates a high risk of COVID-19 infection and spread for all involved as well as their local communities when they return home. "The public interest requires that this civil trial … be continued." *Quinn*, 2020 WL 2846662, at *1.

**C.    A Continuance Will Not Prejudice Plaintiff and is Available to Cure Any Prejudice.**

As demonstrated above, Bard would be severely prejudiced by a December trial. Yet Plaintiff would suffer no prejudice from a continuance of a few months. The *Wright* case is among

---

[35] The risk of exposure is not limited to the courtroom either. This Court's 16th floor courtroom, which "sits atop a highly trafficked federal building that houses several agencies, presents special challenges. Jurors, attorneys, and the public must go through security twice and ride an elevator to get to the court's lobby." Madison Alder & Holly Barker, *Tents, Smoke Machine: Judges Get Creative on Jury Trial Restart*, BLOOMBERG LAW (Aug. 27, 2020, 4:51 AM), https://news.bloomberglaw.com/us-law-week/tents-smoke-machine-judges-get-creative-on-jury-trial-restart.

more than 8,000 cases that were filed in or transferred to the MDL by the time it closed in May 2019. Hundreds of those cases have since been remanded or transferred to district courts across the country for case-specific discovery and trial, including hundreds transferred at the same time that the *Wright* case was received by this Court in September 2019. None of these hundreds of cases have trial settings over the next few months during the height of the COVID-19 pandemic. In fact, on September 2, 2020, an October 2020 trial setting in Florida in a case brought by these same plaintiffs' attorneys was continued until 2021. There are many plaintiffs across the country who have trial dates in 2021 or later – including many of Plaintiff's counsel's own clients. Thus, Plaintiff's counsel cannot reasonably argue that Ms. Wright is prejudiced because of a brief delay when they have agreed to dozens if not hundreds of scheduling orders around the country that ask for 2021 or later trial dates in cases remanded in September 2019.

Simply put, Plaintiff can show no urgency to rush to trial in this case. Plaintiff seeks money damages, not injunctive relief. "A continuance of all remaining deadlines can cure any potential prejudice caused by the delay." *Donaire v. BP Expl. & Prod.*, No. 19-235, 2020 U.S. Dist. LEXIS 116334, at *6 (E.D. La. July 2, 2020) (granting trial continuance where counsel diligently prepared for trial, but the COVID-19 pandemic and mandatory countermeasures "caused unprecedented challenges" that warranted delay). Therefore, Bard requests that the Court grant its Motion. *Id.*

### III.  CONCLUSION

For the foregoing reasons, Bard respectfully requests that the Court grant its Motion.

Respectfully submitted,

*/s/ Melissa Dorman Matthews*
Richard B. North, Jr.
Georgia Bar No. 545599
Richard.North@nelsonmullins.com
Brandee J. Kowalzyk
Georgia Bar No. 142328
Brandee.Kowalzyk@nelsonmullins.com

- 25 -

Taylor Tapley Daly
Georgia Bar No.697887
Taylor.Daly@nelsonmullins.com
Elizabeth C. Helm – Admitted *Pro Hac Vice*
Georgia Bar No. 289930
Kate.Helm@nelsonmullins.com
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000

and

Melissa Dorman Matthews
Texas Bar No. 00790603
mmatthews@hartlinebarger.com
Jordan E. Jarreau
Texas Bar No. 24110049
jjarreau@hartlinebarger.com
**HARTLINE BARGER LLP**
8750 N. Central Expy., Suite 1600
Dallas, Texas 75231
Telephone: (214) 369-2100

*Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record on this 16th day of October, 2020.

*/s/ Melissa Dorman Matthews*
Melissa Dorman Matthews