UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MISTY GREGER, ET AL. | § | |
| | § | |
| v. | § | CIVIL NO. 4:19-CV-675-SDJ |
| | § | |
| C.R. BARD, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are sixteen motions filed by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard"), including six motions to strike or limit particular expert testimony and ten notices adopting motions made in multidistrict litigation ("MDL") to exclude expert testimony or to disqualify certain experts (collectively, "the motions"). Due to the motions' relative similarity to one another with respect to factual background, legal standard, and relief sought, the Court will address all sixteen motions in this order. The motions are resolved in each individual section below as described and for the reasons provided therein.

## I. BACKGROUND

The inferior vena cava ("IVC") is a large vein through which blood passes to the heart from the lower body. Blood clots may develop in the IVC and travel to the heart and lungs. The "IVC filter" is a medical device that can be implanted in the abdomen and is designed to prevent such blood clots from reaching the heart and lungs.

In November 2004, Plaintiff Misty Greger underwent a medical procedure involving the implantation of an IVC Filter ("IVC Filter," "Recovery Filter," or

1

"Filter"). The Recovery Filter was designed, manufactured, marketed, distributed, and sold by Bard. In August 2019, Misty Greger visited a physician and underwent imaging of her torso. Upon doing so, Greger learned that the Recovery Filter System had migrated and that struts had perforated Greger's caval wall. Believing that the displaced Filter had already caused—and would cause additional—serious injury, Greger elected to undergo an emergency filter-removal procedure. As a result of the displaced Filter and the procedure required to remove it, Greger alleges, Greger has experienced significant pain and suffering and loss of quality of life and has incurred substantial medical expenses. Greger further alleges that her earning capacity is diminished.

Consequently, on September 18, 2019, Plaintiffs Misty Greger and Joey Greger, Misty's husband, filed this products-liability action for damages against Bard.[1] In this action, sounding in negligence and strict products liability, Greger alleges that Bard misrepresented the safety of the Filter and, inter alia, negligently designed, developed, marketed, distributed, and sold the device as safe and effective. In support of her claims, Greger alleges that the Filter is susceptible to various phenomena that pose unreasonable health risks, including fracturing, migrating, excessive tilting, and perforation of the caval wall. These phenomena, Greger alleges, can result in life-threatening injuries, such as death, hemorrhage, cardiac/pericardial

---

[1] Originally, Misty Greger filed this action "*et ux.*" Joey Greger, her husband. However, on January 8, 2021, the parties filed a proper stipulation of dismissal as to Plaintiff Joey Greger pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Consequently, Joey Greger has been terminated as a party and only Misty Greger remains as Plaintiff. Henceforth, when the Court refers to "Plaintiff" (singular) or "Greger," this denotes Misty Greger.

tamponade, cardiac arrhythmia, and other systems similar to myocardial infarction, severe and persistent pain, perforation of tissue, vessels, and organs, and inability to remove the device.

Greger has designated numerous expert witnesses to opine on medical, engineering, and economic questions relevant to this litigation. Significantly, several such experts have already produced opinions in an MDL against Bard, proceeding in the District of Arizona. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL-15-02641-PHX-DGC (D. Ariz. 2015) (hereinafter "*Bard MDL*"). That MDL was formed to conduct pre-trial discovery regarding common factual and legal issues in thousands of cases, including hundreds of cases involving Greger's counsel of record in this case, as quickly and efficiently as practicable. However, before Greger learned of her injury, the MDL had stopped accepting new cases. Thus, Greger filed a separate action directly in this Court. Notably, because "general expert discovery was completed as part of the MDL," the Court's Scheduling Order directed the parties to conduct only "case-specific expert discovery" in this action, except as needed to supplement general expert discovery under Federal Rule of Civil Procedure 26(e). (Dkt. #136 at 4).

## II. LEGAL STANDARD

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that trial judges must ensure that any scientific testimony or evidence admitted is not only relevant but reliable. The *Daubert* test, which examines the underlying theory on which an expert opinion is based, thus clarified that the admissibility of expert testimony turns not on whether

3

the testimony is correct but instead on whether it is reliably reached. *E.g.*, *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Subsequent to *Daubert*, Congress amended Federal Rule of Evidence 702 to provide that a witness "qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting Fed. R. Evid. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical" analysis and "'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting Fed. R. Evid. 702). Further, "[t]he proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016).

*Daubert* sets forth four specific factors that the trial court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability, however, is "flexible," and these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how*

to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

In conducting *Daubert* analysis, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III. DISCUSSION

#### A. Bard's Motions to Strike

##### 1. Bard's Motion to Exclude or Limit Opinions and Testimony of Darren R. Hurst, M.D.

Greger has designated Dr. Darren R. Hurst, M.D., as a general and specific witness in the field of interventional radiology. Dr. Hurst is a full-time physician and has served as Chief of Vascular & Interventional Radiology at St. Elizabeth Health System in Northern Kentucky for nearly twenty years. (Dkt. #47-1 at 34). Dr. Hurst completed his fellowship in interventional radiology at the University of Michigan Medical Center and is board-certified in both vascular and interventional radiology. (Dkt. #47-1 at 34, 36). Dr. Hurst further attests that he has personal experience with the use and implementation of IVC filters and is familiar with medical literature concerning IVC filters and the various risks and complications associated therewith. (Dkt. #47-1 at 3). Dr. Hurst has previously been qualified as a general expert on these matters in the MDL. *Bard MDL*, (Dkt. #9772) (Jan. 22, 2018).

Bard argues that: (i) Dr. Hurst's opinions excluded by the MDL order should be excluded here; (ii) Dr. Hurst is not qualified to offer certain opinions and testimony in this litigation; (iii) this Court should exclude Dr. Hurst's opinions regarding specific causation as unsupported and unreliable; and (iv) this Court should exclude Dr. Hurst's opinions regarding future risks and complications as unsupported and unreliable. The Court grants in part and denies in part Bard's motion.

### i. MDL Exclusions

Bard requests that this Court exclude opinions that were excluded by the MDL court. *See Bard MDL*, (Dkt. #9772) (Jan. 22, 2018). While Bard and Greger concur that this Court should follow the MDL order, there is disagreement as to what precisely that order held. Bard argues that two statements from Dr. Hurst's expert report present the same or substantially similar opinions to those struck in the MDL order and should therefore be excluded in this case. Specifically, Bard highlights the following two statements from the Hurst report: (a) "Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates of fracture, embolization of fractured components, penetration, migration, including the known risk of death associated with [Bard filters] in comparison to [the Simon Nitinol Filter] and competitor filters," (Dkt. #47-1 at 10); and (b) "Bard elected not to perform additional studies to further evaluate the safety, effectiveness, and durability of their filters," (Dkt. #47-1 at 13).

### a. Higher Complication Rates

As to the first statement, Bard contends that Dr. Hurst's opinion regarding Bard's failure to notify is "strikingly similar" to an opinion struck in the MDL order—"that Bard failed to notify operating physicians and the implanted patients of the much higher complication rates associated [with its filters]." *Bard MDL*, (Dkt. #9772) (Jan. 22, 2018). In that order, the MDL court held that Dr. Hurst could not testify that Bard filters in fact have higher complication rates than similar filters because "Dr. Hurst has not conducted any study of IVC filter complication rates . . . [n]or has he identified any 'reliable principles and methods' he used in forming" his opinions. *Id.* at *4–5 (quoting FED. R. EVID. 702(c)). Further, as the MDL court found, Dr. Hurst "does not state that he has collected clinical data from his personal cases that reveal IVC filter complication rates, nor that his education and training revealed anything about such rates." *Id.* at *4. Thus, the MDL court concluded, "Dr. Hurst cannot simply repeat the opinions of others as his own when he has done nothing to verify the accuracy of the opinions." *Id.* (quoting *In re Matter of Complaint of Ingram Barge Co.*, 2016 WL 4366509, at *4 (N.D. Ill. Aug. 16, 2016)). Nevertheless, "[a]s an experienced interventional radiologist with years of practice, Dr. Hurst clearly is qualified to opine about the information physicians and patients need and expect when making decisions about the use of IVC filters." *Id.* at *4.

This Court agrees with the MDL court. Under *Daubert* and Rule 702, Dr. Hurst may not testify that Bard IVC filters do in fact have higher complication rates than similar filters. *Id.* at *4–5. However, Dr. Hurst may testify that, if Bard IVC filters

did, in fact, have higher complication rates than other IVC filters, then, in Dr. Hurst's expert opinion as a practicing interventional radiologist, a physician would reasonably expect such information to be disclosed, i.e., for physicians to be notified. *Id.* at *3–4.

### b. Bard's Internal Knowledge and Decision-making

As to the second statement, Bard argues that this Court should exclude—as the MDL court did—any opinion of Dr. Hurst's "about what Bard knew, did, or failed to do." (Dkt. #46 at 8). Specifically, Bard objects to Dr. Hurst's statement that "Bard elected to not perform additional studies to further evaluate the safety, effectiveness, and durability of their filters." (Dkt. #47-1 at 13). In response, Greger asks that this Court deny Bard's motion to the extent that Bard's motion "seeks to expand in any way upon" the MDL court's ruling. (Dkt. #108 at 7).

The Court agrees with the MDL court that Dr. Hurst cannot testify "about what was known within Bard or what was or was not done within Bard." *Bard MDL*, (Dkt. #9772 at 7) (Jan. 22, 2018). Consistent with the MDL court's ruling, this Court finds that Greger has "identified no basis upon which Dr. Hurst can render expert opinions about what happened internally at Bard — what it knew, what it did, or what it failed to do in the development and marketing of its IVC filters." *Id.* Thus, Dr. Hurst may not testify about Bard's internal knowledge or decision-making.

### ii. Filter IFU, Reasonable Expectations of Physicians and Patients, and Design

Bard next argues that Dr. Hurst is not qualified to offer his opinion about: (a) the sufficiency of Bard's filter Instructions for Use ("IFU"); (b) the reasonable

expectations of physicians and patients; and (c) the design of Bard's filter. As to the first two opinions, Greger responds that the MDL court has already found Dr. Hurst qualified to render such opinions[2] and that Bard may not presently challenge general opinions offered in the MDL. (Dkt. #108 at 7–10). As to the third opinion, Greger argues that Dr. Hurst is not opining on the filter design but rather its performance, i.e., the device's "fail[ure] to perform as a reasonable physician and/or patient would expect." (Dkt. #108 at 11). The Court concludes that Dr. Hurst is qualified to testify on all three issues.

### a.  Bard's Filter IFU

With respect to Dr. Hurst's opinion about the sufficiency of Bard's filter IFU, the Court holds that Dr. Hurst may testify about the adequacy of the IFU from the perspective of a treating physician. Bard argues that Dr. Hurst is not qualified to render opinions about the IFU because he is "not an IFU expert and has not established that he has sufficient knowledge as to what the FDA [(Federal Drug Administration)] requires be included in an IFU." (Dkt. #46 at 9). Further, Bard contends that Dr. Hurst's "Expert Report does not establish that he researched or investigated whether the FDA found the content of Bard's IFU to be sufficient." (Dkt. #46 at 10). But Dr. Hurst does not suggest anywhere in his Report that Bard's IFU failed to meet FDA standards and regulations. Nor does Dr. Hurst hold himself

---

[2] Specifically, Greger argues that Dr. Hurst's opinion on the IFU "is a subset of Dr. Hurst's more global opinion regarding Bard's failure to notify," which the MDL court found Dr. Hurst qualified to provide. (Dkt. #108 at 7); *see also supra* Part III.A.1.a. "Dr. Hurst's opinion regarding Bard's IFUs was in his MDL reports, and he testified about same at the MDL trials." *Bard MDL,* (Dkt. #11598 at 6) (June 19, 2018). The Court concurs but, in any event, addresses the merits of Bard's IFU-related objection.

out as a regulatory expert. Rather, Dr. Hurst makes clear that he is opining on the adequacy of the IFU from the perspective of a physician making medical decisions. So long as Dr. Hurst limits his testimony regarding the IFU to opinions derived from training and experience as a treating physician, Dr. Hurst may opine on the adequacy of the IFU.

### b. Reasonable Expectations of Physicians as to Medical Devices

Second, Bard objects to Dr. Hurst's opinions regarding the "[r]easonable expectations of physicians for medical devices and informed consent" as "purely speculative and unsupported." (Dkt. #46 at 10). Specifically, Dr. Hurst opines that he and his physician colleagues "have expectations of medical device companies . . . when [such companies] design, test, manufacture, market, and sell medical devices . . . [that] allow[] physicians to select the appropriate IVC filter and make appropriate therapeutic decisions on behalf of their patients as to whether . . . to use or not use a particular type of IVC filter." (Dkt. #47-1 at 8).

As the MDL court has held and this Court has reiterated, "Dr. Hurst clearly is qualified to opine about the information physicians and patients need and expect when making decisions about IVC filters." *Bard MDL*, (Dkt. #9772 at 4) (Jan. 22, 2018). Thus, the Court concurs with the MDL court's ultimate conclusion that Dr. Hurst may opine on what "reasonable physicians and patients expect from

medical device manufacturers," as Dr. Hurst's "training and years of experience as an interventional radiologist qualifies him to opine on these subjects."[3] *Id.* at 8.

### c.  Design Versus Performance

Third, Bard objects to what it characterizes as an impermissible design opinion of Dr. Hurst. (Dkt. #46 at 11). Both parties agree that Dr. Hurst is neither a design expert nor an engineering expert and thus that any opinion about the specific design or construction of the IVC filter would exceed Dr. Hurst's expertise. (Dkt. #46 at 11); (Dkt. #108 at 11–12). The parties disagree, however, about whether Dr. Hurst has in fact stated an opinion as to the design of Bard's Filter.

Bard specifically objects to Dr. Hurst's opinion that Bard's Filter "failed to perform as a reasonable physician and/or patient would expect in that the filter tilted significantly, and caudally migrated, which resulted in multiple penetrations of the IVC by the arms and legs of the filter with eventual fracture and embolization  of  an arm of the filter." (Dkt. #47-1 at 15–16).[4] Despite Bard's objections to the contrary, the Court does not view Dr. Hurst's opinion as going to the design of the Filter; rather, Dr. Hurst opines  on the performance of the Filter and what he believes happened to

---

[3] At the time of the MDL court's opinion on this issue, Bard had not yet made such an objection to Dr. Hurst's testimony. However, because the plaintiff raised the issue in its responsive briefing before the MDL court, the MDL court addressed the question. Now that Bard has made a formal objection to Dr. Hurst's testimony about the reasonable expectations of physicians and patients, this Court concludes that the MDL court's reasoning is sound and issues a ruling consistent with that reasoning.

[4] In this and other testimony, Dr. Hurst appears to offer opinions on the specific cause of Greger's injuries. Below, the Court concludes that Dr. Hurst may not testify as to specific medical causation. Here, though, the Court merely holds that Dr. Hurst's above-listed testimony is not inadmissible on the ground that it constitutes an improper "design" opinion.

the IVC Filter inside of Greger. Bard has failed to explain why Dr. Hurst should be barred from testifying as to what a reasonable physician, applying his or her medical training and experience, might expect happened to the Filter. As Greger notes, Dr. Hurst has placed at least 400 IVC filters in his lifetime and has reviewed numerous data and studies on IVC filters' impact and efficacy; Dr. Hurst is thus qualified to offer his opinion regarding how the Filter performed inside of Greger. *See* (Dkt. #108 at 11); (Dkt. #47-1 at 3). Yet, while Dr. Hurst may opine on the function and performance of the Filter, he may not testify—as explained below—as to specific medical causation. Thus, Dr. Hurst may opine that the Filter, e.g., migrated or fractured, but not—for the reasons provided below—that the Filter is responsible for Greger's injuries.

### iii. Specific Causation

Bard next objects to Dr. Hurst's opinions regarding the specific cause of Greger's injuries as unsupported and unreliable. Dr. Hurst opines that the likely cause of Greger's lower back pain was the penetration by two of the Filter legs of the "L3 vertebral body resulting in reactive changes and edema in the vertebral body suggestive of inflammation." (Dkt. #47-1 at 16). Dr. Hurst further opines that "[a]n arm of the filter also penetrated the duodenum resulting in abdominal pain." (Dkt. #47-1 at 16).

Bard argues that Dr. Hurst failed to properly perform a differential diagnosis by failing to rule out other potential causes of Greger's health problems. Specifically, Bard argues that Dr. Hurst failed to consider Greger's numerous comorbidities, such

as May-Thurner Syndrome, as well as Greger's lengthy and complex medical history, and failed to explain why certain health issues persisted even after Greger's Filter was removed. (Dkt. #46 at 12).

Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). While a "medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness," *id.* at 265 (quotation omitted), the expert—to validly conduct differential diagnosis— must at least provide *some* explanation for ruling out alternative causes at trial. *Chrastecky v. C.R. Bard, Inc.*, No. A-19-CV-1240-LY-SH, 2020 WL 748182, at *6 (W.D. Tex. Feb. 14, 2020). Further, "merely 'ruling out' other possible explanations is not enough to establish reliability; experts must also have some scientific basis for 'ruling in' the phenomenon they allege." *Sims*, 839 F.3d at 401–02 (citations omitted).

Here, the cause of Greger's injuries is squarely at issue. Moreover, Dr. Hurst purports to have reached his conclusion via differential diagnosis. Thus, the Court concludes that Dr. Hurst, and any other experts opining on the specific cause of Greger's injuries,[5] must engage at least to some degree with alternative causes beyond Bard's IVC Filter.

---

[5] The Court concludes that Dr. Hurst has satisfied the initial hurdle of proving general causation, i.e., that it is medically plausible that a fragmented IVC filter arm could cause injuries similar to Greger's: "We know that 60 percent of the time, if you have this kind of appearance on a CT or MRI, that—that back pain is going to be caused—at least some of her back pain, is going to be caused by the filter." (Dkt. #109-4 at 95:2–5). In this sense, Dr. Hurst has "ruled in" the possibility that the Bard filter caused Greger's injury. However, Dr. Hurst

Greger contends that "Dr. Hurst's specific causation opinions are based on his differential diagnosis, his experience, and his review of Greger's medical records and imaging, Bard's internal documents, MDL expert reports, relevant medical literature, and various depositions, including those of Greger and her treating physicians." (Dkt. #108 at 12). Greger adds that "Bard has not identified any alternative causes of Greger's filter failures (other than the filter itself) that Dr. Hurst failed to consider." (Dkt. #108 at 12). For his part, Dr. Hurst alleges that he "took into consideration the plaintiff's co-morbidities, medical history, and preexisting problems, and ruled these out as the cause of her [F]ilter's failure, including perforation, migration, fracture, and fragment embolization to the lung." (Dkt. #108 at 12 n.9); (Dkt. #47-1 at 17).

However, this statement—providing only that Dr. Hurst considered the above-listed factors in reaching his determination—is conclusory because it fails to explain *why* these or other alternative explanations for Greger's injury were unavailing. And even if Dr. Hurst did consider Greger's prior medical history and co-morbidities when determining the cause of the Filter failure, Dr. Hurst makes no mention that he considered other possible causes of Greger's alleged injuries besides Filter failure. Dr. Hurst's assertion thus conflates causation of the Filter failure with causation of Greger's injuries.

In rebuttal, Greger cites several portions of Dr. Hurst's deposition testimony that allegedly illustrate the reliability of Dr. Hurst's differential diagnosis. For

---

must still consider and rule out alternative explanations through a differential diagnosis to prove specific causation, i.e., that Greger's injuries actually were caused by the Bard filter.

instance, Dr. Hurst has explained that May-Thurner Syndrome "is the compression of the left common iliac vein by the overlying and crossing right common iliac artery" and opined that Greger's Deep Vein Thrombosis ("DVT") "was most likely related to central venous obstruction from May-Thurner Syndrome." (Dkt. #108 at 13); (Dkt. #109-4 at 30:20–25). Based on this deposition testimony, Greger argues that "Dr. Hurst did take this condition [(May-Thurner Syndrome)] into account, but it did not cause Greger's filter failure or subsequent pain." (Dkt. #108 at 13). The Court disagrees. While Dr. Hurst may have been aware of Greger's May-Thurner Syndrome, nothing from the cited deposition statement or from the Expert Report reflects that or explains how or why Dr. Hurst used analysis to rule out May-Thurner Syndrome, or any other co-morbidity, as a possible cause of Greger's pain.

Finally, Greger refers to an exchange from Dr. Hurst's deposition where Dr. Hurst was specifically asked about considering alternative explanations in his differential diagnosis:

> Q. Okay. And you -- in coming to your differential diagnosis, did you consider whether Greger had other conditions such as degenerative changes in her lumbar spine?
>
> A. Well, in reviewing her images, she does not have significant degenerative changes in her lumbar spine.

(Dkt. #109-4 at 94:6–12).

To the Court's knowledge,[6] the above exchange is the only instance where Dr. Hurst has directly addressed other possible causes of Greger's injuries as part of

---

[6] Although the Court has access to Dr. Hurst's Expert Report and Rebuttal Report, the parties have provided the Court with only a few, self-serving excerpts from Dr. Hurst's deposition. *See* (Dkt. #109-4). Thus, the Court has only a limited view of Dr. Hurst's

his differential diagnosis. Other than ruling out degenerative changes in the lumbar spine—which Dr. Hurst purports to have done simply by "reviewing [Greger's] images"—Dr. Hurst has not provided any explanation for how or why he ruled out other potential causes for Greger's injuries. While Dr. Hurst need not rule out every possible alternative explanation for Greger's injuries, he must do more than rule out one specific alternative cause, citing only a "review [of] her images" as grounds for his conclusion. And mere conclusory statements that an expert considered and ruled out alternative explanations is likewise insufficient. For the foregoing reasons, Dr. Hurst's testimony as to specific causation is excluded.

### iv. Future Risks and Complications

Finally, Bard seeks to exclude Dr. Hurst's opinion regarding the future risks and complications that the fractured Filter arm allegedly poses to Greger as overly speculative and unreliable. In Dr. Hurst's opinion, "there are additional risks of hemorrhage, infection, pulmonary artery pseudoaneurysm, pleurisy, chronic cough, and pneumothorax," which "could result in significant morbidity or death."[7] (Dkt. #47-1 at 16). To support its contention that Dr. Hurst's opinion is overly speculative, Bard points to Dr. Hurst's deposition testimony that "the future behavior

---

statements from his deposition. To the extent Greger is able to present testimony that rebuts or contextualizes Bard's deposition excerpts, the Court will revisit the admissibility question.

[7] Dr. Hurst also opines that "the failure of [Greger's] Recovery filter and the subsequent surgery has put her at increased risk of chronic abdominal pain, DVT, and chronic back pain/radiculopathy." (Dkt. #47-1 at 16). Although Bard does not specify whether it objects to this particular opinion regarding future risks and complications, the Court will construe Bard's general objection "regarding future risks and complication" as relating to this statement as well.

of the fragment is unknown" and that "[s]peculation or not, you—we can call it whatever we want . . .  [n]either of us knows exactly what's going to happen to that fragment." (Dkt. #46 at 13); (Dkt. #47-4 at 112:18–24).

Neither of these statements by Dr. Hurst renders his opinion about potential future risks inadmissible. Dr. Hurst opines only that, based on his extensive experience, "there are additional risks" of certain medical problems and complications because of the apparently fractured Filter arm inside Greger. (Dkt. #47-1 at 16). That the future effects of a medical condition are unknown is axiomatic and does not bar a physician from opining on such effects. *See, e.g.*, *Miller v. Gorski Wladyslaw Estate*, No. 04-1250 c/w 05-189, 2006 WL 3436230, at *1–2 (W.D. La. Nov. 27, 2006) (a physician with extensive experience treating burn patients was permitted under *Daubert* to opine on the likelihood of complications for burn patients, including the risk of future amputation).

Dr. Hurst is therefore not speculating about causation; rather, he is offering his expert medical opinion about the future risks associated with a physical condition and clarifying that certain complications may, but are not guaranteed to, manifest. So long as Dr. Hurst makes clear that he is opining only on potential future risks that the Filter poses to Greger, he may testify.

For the foregoing reasons, Defendants' Motion to Exclude or Limit Opinions and Testimony of Darren R. Hurst, M.D., (Dkt. #46), is **GRANTED in part** and **DENIED in part**.

**2. Bard's Motion to Exclude or Limit the Opinions and Testimony of Dr. Robert O. Ritchie**

Dr. Robert O. Ritchie, Ph.D., is a materials scientist and Professor of Materials Science and Mechanical Engineering at the University of California, Berkeley. Dr. Ritchie was also, inter alia, Chairman of the Berkeley Materials Science & Engineering Department from 2005 to 2011. Greger has designated Dr. Ritchie as an expert in the fields of materials science, fracture mechanics, and fatigue fracture, particularly the latter, as it relates to the alleged "failure of the Bard Peripheral Vascular inferior vena cava (IVC) Recovery" implanted in Greger. Especially pertinent here, Dr. Ritchie has fifty years of experience analyzing medical-device structure and failure, including testifying before the FDA on the fatigue, fracture, and endurance of medical devices and conducting over thirty-five years of active research on the fatigue and failure of Nitinol, the particular alloy from which Bard IVC filters are made. (Dkt. #106 at 2–3) (citation omitted).

Dr. Ritchie was qualified as a general expert on these topics in the MDL court, which excluded two of Dr. Ritchie's opinions—namely, that Bard filters have "unacceptably high" complication rates and that the Simon Nitinol Filter ("SNF") is a safer alternative filter than the Bard Recovery and G2 filters. *Bard MDL*, 2018 WL 775295, at *2–3, 5 (Feb. 8, 2018).

Here, Bard argues that (1) Dr. Ritchie's opinions that were excluded by the MDL court should also be excluded by this Court, (2) Dr. Ritchie's opinions regarding the sufficiency of Bard's testing should be excluded, (3) Dr. Ritchie's opinions implicating medical causation should be excluded because he is unqualified to give

medical opinions, and (4) that Dr. Ritchie should not be allowed to offer as testimony impermissible conclusions of law. (Dkt. #48).

### i. Opinions Excluded by the MDL Court

The Court concludes that Dr. Ritchie's opinions as to Bard's filter complication rates fail to satisfy Rule 702 and *Daubert* and that the MDL court properly excluded Dr. Ritchie's testimony on that basis. As the MDL court explained:

> Dr. Ritchie's expertise is in the fields of mechanical engineering and materials science. He is not a medical doctor, biostatistician, or epidemiologist experienced in interpreting medical studies and data about device failure rates. And he has identified no other expertise or specialized knowledge that enables him to opine that Bard filters have unacceptably high complication rates.

*Bard MDL*, 2018 WL 775295, at *2. For the reasons provided in the MDL court's holding, Dr. Ritchie will not be allowed to testify concerning the Bard filters' allegedly "high" or "unacceptable" complication rates.

### ii. The Sufficiency of Bard's Testing

Bard next objects to Dr. Ritchie's opinions regarding the sufficiency of Bard's testing of its filters. (Dkt. #48 at 8–11). Greger responds that Dr. Ritchie's opinions are both reliable and admissible and that this Court should follow the MDL court's holding that Dr. Ritchie may opine on Bard's testing. (Dkt. #106 at 5). The MDL court found Dr. Ritchie "qualified to opine about Bard's testing of its IVC filters" and that his methodology was sufficiently reliable. *Bard MDL*, 2018 WL 775295, at *4. The Court agrees and finds Bard's attempt to relitigate this issue unpersuasive. For instance, Dr. Ritchie's opinion that Bard "only performed minimal stress analysis . . . and had a totally inadequate experimental testing protocol . . . ," (Dkt. #49-1 at 28),

19

is admissible because it involves Dr. Ritchie applying his expertise in mechanical engineering, materials science, and medical devices to assess Bard's testing protocols.[8]

Bard counters that its instant objections to Dr. Ritchie's testing opinions raise different issues than what the MDL court addressed. (Dkt. #121 at 3); (Dkt. #48 at 8–10). Specifically, Bard argues that some of Dr. Ritchie's opinions veer into "thinly-veiled, inadmissible corporate motive opinions." (Dkt. #121 at 3). For instance, Bard points to Dr. Ritchie's statement that "Bard displayed 'disregard for, or ignorance of, the potentiality of fatigue failures,'" (Dkt. #49-2 at 7), as an example of an opinion regarding subjective motive, belief, or intent of a corporate entity.

It is true that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 547 (S.D.N.Y. 2004). Likewise, courts have held that "[p]ersonal views on corporate ethics and morality are not expert opinions." *In re Baycol Prods. Liab. Litig.,* 532 F.Supp.2d 1029, 1053 (D. Minn. 2007). The Court has already established that Dr. Ritchie may opine on the sufficiency of Bard's IVC testing. Thus, to the extent, Dr. Ritchie opines that Bard's testing objectively failed to account for fatigue failure, such testimony is admissible. However, to the extent Dr. Ritchie is opining that Bard actually or likely held a particular intent or motive in undertaking its IVC

---

[8] It is clear that Dr. Ritchie has actual knowledge of Bard's testing practices. *See* (Dkt. #106 at 7) (enumerating the sources and methods that Dr. Ritchie employed in his analysis).

testing, e.g., that Bard deliberately disregarded the potential for fatigue failures, such testimony is inadmissible.

In sum, Dr. Ritchie may opine on Bard's objective actions or inactions with respect to IVC filter testing, and the sufficiency thereof, but may not opine on Bard's subjective intent, motives, or internal decision-making involved in such testing.

### iii. Medical Opinions

Bard next objects to what it alleges are medical opinions, including medical-causation opinions, made by Dr. Ritchie. (Dkt. #48 at 11–12). Both parties agree that Dr. Ritchie is not a medical expert, and Greger implicitly acknowledges that Dr. Ritchie cannot give medical opinions. (Dkt. #48 at 11); *see* (Dkt. #106 at 9). However, the parties disagree as to whether Dr. Ritchie has, in fact, offered medical opinions.

Bard points to several instances where Dr. Ritchie makes medical-related statements. For example, Dr. Ritchie opines that IVC filter defects can:

> lead[] to malfunction of the filter and the often severe medical complications of the potential migration of wire fragments to other parts of the body. When failures such as fracture, migration and/or perforation of the vena cava occur, this places unnecessary risks on the patient in having the device and fragments of the device removed; moreover, if such failures render the device unable to be removed, it creates the unacceptable situation of having a device that is unusually prone to fracture remaining in the body permanently.

(Dkt. #49-1 at 20).

While Bard has failed to identify *specific*-causation opinions made by Dr. Ritchie about Greger, Dr. Ritchie's testimony, *supra*, contains *general*-causation opinions about the effect of IVC filters on an implantee's body generally. These are

21

impermissible. Dr. Ritchie is not qualified to testify that IVC filters can "lead[] to . . . often severe medical complications," nor may Dr. Ritchie opine that IVC filter malfunction may "place[] unnecessary risks on the patient in having the device and fragments of the device removed." Both are self-evidently statements of medical causation, recommendation, or diagnosis, which must derive from medical expertise to be valid. Similarly, Dr. Ritchie may not opine that, if the device is unremovable, this constitutes an "unacceptable" situation, because such a conclusion is a medical opinion. Dr. Ritchie may, however, testify, as to the Filter's design and the risks of fracturing or other alleged malperformance inherent to the design.[9]

Because Dr. Ritchie cannot offer medical opinions, the Court grants Bard's motion to exclude Dr. Ritchie's testimony about any medical complications arising from IVC filters.

### iv. Legal Conclusions

Finally, Bard argues that Dr. Ritchie should not be allowed to provide any legal conclusions, including that Bard's filter suffered from a "serious manufacturing defect" and an "egregious form of defect." (Dkt. #48 at 12–14). Greger responds that Bard misconstrues Dr. Ritchie's opinions and that Dr. Ritchie has not offered a single legal conclusion. (Dkt. #106 at 11). Greger adds that Bard has not cited to any purported legal conclusions of Dr. Ritchie "other [than] his use of the phrases 'serious

---

[9] Although Dr. Ritchie's medical-related opinions may be, as Greger argues, at the "periphery" of Dr. Ritchie's report, (Dkt. #106 at 9), an impermissible expert opinion is not cured simply because it makes up only a small fraction of an expert's report. Nor does being located at the "periphery" make a medical opinion something other than a medical opinion.

manufacturing defect'; 'egregious form of defect'; and 'extremely egregious.'" (Dkt. #106 at 12).

Federal Rule of Evidence 704 makes clear that experts may opine on an "ultimate issue" in a case. FED. R. EVID. 704. However, "an expert witness is not permitted to offer conclusions of law." *United States v. Oti*, 872 F.3d 678, 691 (5th Cir. 2017). An expert cannot "merely tell the jury what result to reach." *Id.* (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 n.4 (5th Cir. 1992)). Dr. Ritchie's opinion that Bard's filter was "defective" and suffered from "serious manufacturing defect" is an impermissible legal conclusion because such language has a distinct legal meaning and is a legal term of art.[10] *See Warren v. C.R. Bard, Inc.*, No: 8:19-cv-2657-T-60JSS, 2020 WL 1899838, at *3 (M.D. Fla. Apr. 17, 2020) (granting the defendant's motion to exclude expert testimony that product was "defective" and "unreasonably dangerous"); *Sutphin v. Ethicon, Inc.*, No. 2:14-cv-01379, 2020 WL 2517235, at *2 (S.D. W. Va. May 15, 2020) (holding that an expert was not permitted to testify that the medical device in question was "defective"). Dr. Ritchie is not allowed to offer legal conclusions, and to the extent that he uses the term "defective" or its derivatives, such language will be excluded.

For the foregoing reasons, Defendants' Motion to Exclude or Limit the Opinions and Testimony of Dr. Robert O. Ritchie, (Dkt. #48), is **GRANTED in part** and **DENIED in part**.

---

[10] Indeed, Dr. Ritchie himself seemingly acknowledges that such language embraces legal conclusions. (Dkt. #48-4 at 40:20–22) ("I understand that . . . in the legal sense with a medical device, manufacturing defect is what is important.").

### 3. Bard's Motion to Exclude or Limit Opinions and Testimony of Krishna Kandarpa, M.D.

Dr. Krishna Kandarpa is an interventional radiologist and a director at the National Institute of Biomedical Imaging and Bioengineering. In 2006 and 2007, he was hired to conduct and monitor the EVEREST Study, which examined whether Bard's G2 filter, the subject of this litigation, could be safely retrieved after implantation. (Dkt. #50-1). The MDL overruled Bard's objections where Dr. Kandarpa's opinion drew from his role as medical monitor in the EVEREST study but sustained objections where his opinion was based on his general expertise.

In its motion, Bard argues that: (i) Dr. Kandarpa's opinions and testimony should be struck for failing to comply with Federal Rule of Civil Procedure 26(a); (ii) Dr. Kandarpa's medical-monitoring testimony is not relevant; and (iii) Dr. Kandarpa's opinions are not reliable.

#### i. Rule 26(a)

Bard contends that Dr. Kandarpa's opinion and testimony should be struck for failure to comply with Federal Rule of Civil Procedure 26(a).[11] In Greger's initial disclosures, Dr. Kandarpa was designated as a retained expert witness. Under Rule

---

[11] Bard filed two similar motions to exclude the opinions of Dr. Kandarpa in the Western District of Missouri. Both were denied. *Lampton v. C.R. Bard, Inc.*, No. 4:19-cv-00736-NKL, (Dkt. #159) (W.D. Mo. Nov. 23, 2020); *Lampton v. C.R. Bard, Inc.*, No. 4:19-cv-00734-NKL, (Dkt. #180), (W.D. Mo. Nov. 27, 2020). Additionally, in the MDL court's bellwether case, the court denied Bard's objections to Dr. Kandarpa's opinions "based primarily on his role as a medical monitor of the Everest study." *Bard MDL*, (Dkt. #12590 at 2–5). By contrast, where Dr. Kandarpa's opinion derived from his general expertise, the MDL court sustained Bard's objections. *Id.* This Court agrees with that conclusion for the reasons provided herein.

24

26(a)(2)(B), a retained expert witness must provide a written expert report, specifying in detail the opinions to be offered and the factual basis for such opinions.

Here, Greger did not provide an expert report. However, Greger claims that Dr. Kandarpa's initial designation was inadvertent, that Dr. Kandarpa is in fact not retained, and that, accordingly, Greger did not need to provide a detailed expert report as to Dr. Kandarpa's testimony. However, under Rule 26(a)(2)(C), a party still has disclosure obligations with respect to a non-retained expert. Specifically, the party must disclose (1) "the subject matter on which the witness is expected to present evidence" and (2) "a summary of the facts and opinions to which the witness is expected to testify." Greger argues that the summary provided in her initial disclosures satisfies Rule 26(a)(2)(C).

In its designation of experts and opinion testimony, Greger disclosed that Dr. Kandarpa is anticipated to testify regarding "the design and function of the Bard G2 IVC filter, the EVEREST study, the performance of the Bard G2 filter in the human body, the observations he made and opinions he developed regarding the EVEREST study and the G2 IVC filter." (Dkt. #50 at 5). Greger further disclosed that Dr. Kandarpa will testify "regarding the observations and opinions he has developed regarding the safety, efficacy and performance of the G2 IVC filter" and "offer observations and opinions as to what reasonable physicians knew about the G2 IVC filter, what information reasonable physicians would like to know about the G2 IVC filter, what information was and was not made available to physicians about the G2 IVC filter." (Dkt. #50 at 5). Finally, Greger stated that "[t]he facts and opinions to

25

which Dr. Kandarpa is expected to testify are those set forth in his deposition of July 19, 2018, in *Austin v. C.R. Bard. Inc.*, Circuit Court of The Seventeenth Judicial Circuit, Broward County, Florida and the exhibits thereto." (Dkt. #50-1 at 9).

Bard argues that Greger's reference to deposition testimony is not sufficient to constitute full disclosure of "the subject matter on which the witness is expected to present evidence and (2) a summary of the facts and opinions to which the witness is expected to testify," in compliance with Rule 26(a)(2)(C).

The Court disagrees. The core purpose of Rule 26(a) is to require parties "to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." FED. R. CIV. P. 26(a) advisory committee's note to 1993 amendment. Here, Greger timely designated Dr. Kandarpa as an expert, non-retained witness. Moreover, Dr. Kandarpa has already testified in at least two other cases against Bard and Greger has disclosed that Dr. Kandarpa's testimony in this case will be consistent with that given in a specific prior deposition, which Greger has likewise disclosed to Bard. Thus, Greger has at least satisfied, if not exceeded, the degree of detail and notice about Dr. Kandarpa's forthcoming testimony required under Rule 26(a)(2)(C).

### ii. Relevance

Bard argues that this case "does not require medical monitoring testimony" and thus that Dr. Kandarpa's opinions as to medical monitoring should be excluded. Federal Rules of Evidence 401 and 402 govern the relevance of evidence. Rule 401

generally states that "[i]rrelevant evidence is not admissible," and Rule 402 provides the test for relevant evidence. Under Rule 402, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." The Fifth Circuit has interpreted Rules 401 and 402 to reflect that "the [relevance] bar is low." *Hicks-Fields v. Harris County*, 860 F.3d 803, 809 (5th Cir. 2017).

Bard argues that Dr. Kandarpa's opinions are based on his involvement in the EVEREST study of the G2 IVC filter and therefore do not relate to the issues pleaded in Greger's complaint. However, Bard fails to explain why these opinions—which concern the filter at the core of this products-liability action—do not meet the low relevance bar. Further, Greger's products-liability action raises several issues that will need to be proven to determine Bard's liability, if any, that Dr. Kandarpa's opinions could help illuminate, such as whether Bard acted reasonably in marketing its G2 filter, whether the filter was defective, and—if the filter was defective—whether Bard knew it was defective before releasing it. The Court therefore concludes that Dr. Kandarpa's testimony as to the EVEREST study of the G2 IVC filter contains relevant information, a holding consistent with the court's conclusion in *Lampton*, (Dkt. #180 at 5–6) (Nov. 27, 2020).

### iii. Reliability

Finally, Bard argues that Greger has not established that Dr. Kandarpa's opinions are sound or generally accepted. However, the reliability of Dr. Kandarpa's testimony was already addressed by the MDL court and Bard has not alleged any

case-specific circumstances that would justify relitigating that issue. Therefore, the Court adopts the MDL court's reasoning and denies Bard's objections.

For the foregoing reasons, Defendants' Motion to Exclude or Limit Opinions and Testimony of Krishna Kandarpa, M.D., (Dkt. #50), is **DENIED**.

### 4. Bard's Motion to Limit or Exclude Certain Opinions and Testimony of Leigh Anne Levy, RN

Leigh Anne Levy is a registered nurse and life care planner. Greger has designated Levy as an expert witness to offer opinions on a life care plan for Greger and the costs associated with Greger's future healthcare needs. Bard seeks to exclude Levy's testimony and her life care plan as unreliable. Specifically, Bard argues that: (i) Levy is not a medical doctor and is therefore unqualified to render the opinions she provides; (ii) Levy's opinions are speculative in nature; and (iii) Levy's testimony is based on unreliable facts, data, and methodology as well as the report of a consultant not disclosed as an expert.

#### i. Qualifications

As to Levy's qualifications, she has a bachelor of science in nursing, a master of science in nursing, and has completed doctoral coursework. Regarding clinical experience, Levy is a trauma nurse with over twenty-five years' experience as a registered nurse, including in "level 1" trauma centers. Levy is also a certified life care planner. Levy became certified by completing a university-taught life care program, including authoring a peer-reviewed life care plan, completing a one-year residency with a life care planner, and successfully passing a certification examination. As Levy observes in her life care plan for Greger, "a life care plan is an

analysis of a disability with a cost assessment of medical goods and services over a lifetime continuum."

Levy's experience and credentials qualify her to opine on the cost of medical goods and services associated with a particular disability over the course of an individual's life. Bard has not established that courts require a medical license for a designated expert to opine on life care plans. And, in fact, Levy has developed numerous life care plans for patients with IVC filters and related injuries or disabilities both within and outside of the litigation context, *see, e.g.*, (Dkt. #99 at 8), and numerous courts have deemed Levy's testimony regarding life care plans reliable, *see, e.g.*, *Blintz v. Cont'l Airlines, Inc.*, No. 4:13-CV-0566, 2016 WL 2909394 (S.D. Tex. Mar. 3, 2016); *Campbell v. Tex. Health Harris Methodist Hosp., SW Fort Worth* (348th Dist. Ct., Tarrant County, Tex., Aug. 18, 2017). In view of the foregoing, the Court concludes that Levy is qualified to opine on life care plans.

### ii. Speculation

Second, as to the alleged speculation in Levy's analysis, the Court observes that life care plans, like any estimate of future costs, rely on projections. Based on the information before the Court, Levy's life care plan here and testimony related thereto are no more speculative than any projection of future costs, e.g., those based on estimated income and life expectancy, and no more speculative than any other such plan written by Levy and approved by other courts.

Nevertheless, the Court considers Bard's objections that Levy's life care plan relies on specific causation assumptions that are unreliable. Specifically, Bard argues

that Levy's assumptions as to future medical costs do not withstand *Daubert* scrutiny. But Levy bases her opinions as to future medical costs on the medical reports of undisputedly expert doctors with personal knowledge—that is, those who have completed medical consultations of Greger. These reports have been submitted and can be verified.

The practice of life care planners' relying on physicians' reports and producing estimates of future costs is widely accepted. *See supra* Part III.A.4.i; *Snider v. N.H. Ins. Co.*, No. 14-2132, 2016 WL 3193473, at *2 (E.D. La. June 9, 2016) (life care planners are allowed to "testify as to future healthcare needs, predicated upon the testimony of treating physicians as to the reasonable need for such care, and the cost of such care," so long as the life care planner identifies "the treating physician upon whose report or testimony she relies"); *Thomas v. T.K. Stanley, Inc.*, No. 9-12-CV-158, 2014 WL 12910539, at *3 (E.D. Tex. Oct. 27, 2014) ("The medical records and opinions of treating physicians and other medical providers are the sort of evidence that would be reasonably relied upon to create a life care plan."). And Bard fails to offer a persuasive reason for this Court to deviate from that practice here. Levy is therefore permitted to rely on the reports of physicians with personal knowledge in rendering Greger's life care plan.[12]

---

[12] On April 30, 2021, Greger underwent an upper lobectomy—a major surgery involving the removal of the upper part of Greger's right lung. Greger's counsel failed to apprise either the Court or Bard of the surgery until approximately six weeks after the operation. Because Greger's April 30, 2021 surgery concerned issues at the heart of this litigation, and because the delayed disclosure concededly resulted from Greger's counsel, the Court issued an order, on motion: continuing the trial setting from September 2021 until January 2022, and; permitting new, limited discovery as to Greger's recent lobectomy. (Dkt. #162). Now, after the operation, Levy has revised Greger's life care plan, and other

### iii. Reliability

Third, and finally, the Court considers the reliability of Levy's particular analysis and conclusions in the instant action. For a life care plan analysis to be reliable, "the plaintiff must present evidence to establish that in all reasonable probability (1) medical expenses will be incurred in the future, and (2) what the reasonable cost of that care will be." *Rodriguez v. Larson*, 250 F.App'x 607, 609 (5th Cir. 2007) (per curiam).[13] The medical opinions on which Levy relies, including those by Dr. Richard Weiner, Greger's neurosurgeon, relate to the first prong, while Levy's analysis relates to the second.

Specifically, Levy relies substantially on the opinions of Dr. Hurst, whose pertinent testimony the Court has already deemed reliable. *See supra* Part III.A.1.[14] Additionally, Levy relies in part on reports by Drs. Ritchie and Weiner, neither of

---

expert witnesses—including Dr. Allyn Needham and others upon whom Levy relies—have likewise revised their testimony to reflect factual developments associated with Greger's lobectomy. In turn, Bard has filed an Opposed Motion to Strike Plaintiff's Untimely Expert Reports, (Dkt. #154). However, that motion, which has not yet been fully briefed, concerns only the *timeliness* of Greger's new expert-witness disclosures and therefore does not alter the analysis or conclusion of this memorandum opinion and order.

[13] Both parties, at times, confuse the relevant legal standard and source of law here. The applicable standard, as illustrated above, is preponderance of the evidence and arises out of federal rather than state law.

[14] While the Court excluded certain testimony of Dr. Hurst, upon whom Levy relies in devising the life care plan, no such excluded testimony affects the admissibility of Levy's opinion. For example, the Court struck Dr. Hurst's specific-causation testimony. To formulate a life care plan, Levy need only rely on Dr. Hurst's medical conclusions as to the specific injuries that Greger has incurred, as well as the severity and projected duration thereof, all of which fall within the sphere of Dr. Hurst's expertise and remain admissible. The specific cause of Greger's injuries, among other topics, does not impact life care plans.

whom Bard challenges as unqualified.[15] In fact, Bard appears only to challenge that Levy's reliance on Dr. Weiner's report is too general, that Dr. Weiner treated Greger too cursorily to have rendered an informed opinion, and that Dr. Weiner's methodology and conclusions have not been adequately substantiated. Dr. Weiner is a neurosurgeon who treated Greger in September 2020. After examining Greger, Dr. Weiner produced a report, which is the apparent subject of Bard's challenge. Dr. Weiner concluded that Greger suffers from Complex Regional Pain Syndrome ("CPRS"), which "was most likely due to a combination of lumbar sympathetic chain injury from a migrated IVC filter and possible further nerve damage as a consequence of surgery to extract the device." (Dkt. #99 at 13).

Dr. Weiner is a qualified neurosurgeon who personally examined Greger and timely produced a report as to his conclusions, and Bard has not challenged Dr. Weiner's qualifications or analysis beyond appearing to suggest that Greger's thirty-five-to-forty-minute phone consultation with Dr. Weiner is insufficient to reach a valid medical opinion. Levy is entitled to rely on Dr. Weiner's post-consultation report; Dr. Weiner plainly has the credentials and personal knowledge to produce an opinion here. Finally, as for the reasonable cost of needed healthcare, as established above, Levy is qualified to opine on life care plans and the costs associated with various medical conditions.

---

[15] Bard contends that Greger failed to properly designate Dr. Weiner as an expert witness. However, Greger has not retained Dr. Weiner and does not intend to call Dr. Weiner as an expert witness. Further, Greger properly disclosed Dr. Weiner in her September 25, 2020, expert disclosures and produced Dr. Weiner's medical report to Bard.

For the foregoing reasons, Defendants' Motion to Limit or Exclude Certain Opinions and Testimony of Leigh Anne Levy, RN, (Dkt. #51), is **DENIED**.

### 5. Bard's Motion to Exclude or Limit the Opinions and Testimony of Allyn Needham, Ph.D., CEA

Allyn Needham, Ph.D., CEA, is an economic analyst designated by Greger to offer case-specific opinions as to Greger's alleged lost earning capacity and purported life care plan costs. In his expert report and deposition testimony, Dr. Needham opined that Greger's lost earning capacity totals $233,283.00. (Dkt. #53-2). Bard now moves to exclude Dr. Needham's testimony as to lost earning capacity, arguing that such estimates are unreliable because they: (1) are based on earnings that lack evidentiary support; and (2) fail to consider several relevant factors, including Greger's tax returns, fluctuating income, and business expenses.

Dr. Needham further opines in his updated supplemental report and corresponding deposition testimony that Greger's life care costs are $1,343,795.79, with a present value of $1,487,835.54. (Dkt. #53-3).[16] Dr. Needham's life care cost valuation relies solely on the life care plan developed by Leigh Ann Levy, RN. Bard contends that Levy's plan is unreliable and, therefore, Dr. Needham's report is also unreliable. Bard further contends that Dr. Needham's failure to consider Greger's medical condition before or after her alleged injury renders his valuation unreliable.

---

[16] As noted above, *see supra* Part III.A.4.ii n.12, Dr. Needham has revised his estimates in light of Greger's April 30, 2021, lobectomy. However, nothing about Dr. Needham's revision impacts the Court's reasoning and conclusions here as to the scope of admissible testimony.

Dr. Needham's report included review of, inter alia, Misty Greger's and Joey Greger's rough-draft depositions; Misty Greger's W-2's for 2015–2019; Misty Greger's K-1's from 2015–2019; various other letters and depositions; and data from the Social Security Administration, the IRS, Bloomberg's U.S. Bond and Market Rates data, and the National Center for Health Statistics. Using that information, Dr. Needham calculated Greger's lost earnings as follows. (Dkt. #100-1). First, Dr. Needham calculated Greger's earning capacity—i.e., projected future earnings assuming that Greger had not been injured—by averaging Greger's prior income from 2015 to 2018, before Greger was injured. Dr. Needham then used Greger's income from 2019, the year in which Greger was injured, to estimate Greger's post-injury earning capacity. Dr. Needham applied an annual rate of inflation of 2.03%[17] to both figures and multiplied each figure out consistent with Greger's "work life expectancy," i.e., up to Greger's expected retirement age. Dr. Needham also reduced the income for both figures consistent with applicable tax deductions.

Bard argues that Dr. Needham's methodology and conclusion are unreliable because they lack "sufficient evidentiary support and are based on assumptions not supported by the factual record." (Dkt. #53 at 5). For instance, Bard asserts that Dr. Needham's methods are unreliable because he considered only Greger's W-2 and K-1 forms and failed to consider Greger's tax returns, medical conditions, or industry earning potential. However, courts routinely conclude that similar or less robust lost-earnings calculations are reliable. *See, e.g.*, *Glasscock v. Armstrong Cork Co.*, 946 F.2d

---

[17] Dr. Needham procured this inflation rate from the Survey of Professional Forecasters published by the Federal Reserve Bank of Philadelphia.

1085, 1091 (5th Cir. 1991) (holding that plaintiffs' lost-earnings calculation based on wages and work history was reliable); *Stewart v. Hankins*, No. 4:15-cv-586, (Dkt. #37 at 7–9) (E.D. Tex. Sept. 2, 2016) (concluding that an economist's lost-earning calculation based on the plaintiff's W-2 form, age, race, and sex was reliable).

Next, Bard contends that Dr. Needham's opinions as to Greger's life care plan costs are unreliable and therefore should be excluded. As both parties concede, the reliability—and, consequently, admissibility—of Dr. Needham's life care plan cost valuations turn on the reliability of Levy's plan, on which Needham exclusively relied in producing his estimate. As the Court has already established, *see supra* Part III.A.4.iii., Levy's plan is reliable.

For the foregoing reasons, Defendants' Motion to Exclude or Limit the Opinions and Testimony of Allyn Needham, Ph.D., CEA, (Dkt. #53), is **DENIED**.

### 6. Bard's Motion to Strike Greger's New Post-MDL General Opinions of Expert David Garcia, M.D. Relating to Clot Formation

#### i. Rule 26

Dr. David Garcia, M.D., is an expert witness who has offered opinions on IVC filters' design, function, efficacy, and risks, in numerous forums. One such forum is the MDL court, in which Dr. Garcia authored a report on IVC filters in March 2017. On June 5, 2020, Greger's counsel obtained a new report from Dr. Garcia, which purported to supplement Dr. Garcia's March 2017 opinion and which analyzed clot formation in connection with Bard's IVC filters.

Greger's counsel, Martin Baughman, served the June 2020 report on Bard in another suit in which Baughman is counsel of record: *Wright v. C.R. Bard, Inc.*, No.

3:19-CV-2176-S (N.D. Tex.).[18] On August 3, 2020, Dr. Garcia gave a deposition in *Wright*, in which Bard deposed Dr. Garcia about the IVC filters and clot formation, among other topics. And, on September 25, 2020, Greger timely designated Dr. Garcia as an expert witness for the purposes of offering his opinion on the contents of the June 2020 report. (Dkt. #55-5 at 4). In particular, Greger disclosed that Dr. Garcia will opine on IVC filters' alleged migration and propensity to increase the risk of clot formation.

Now, Bard argues that the Court should strike Dr. Garcia's June 2020 report on clot formation under Federal Rule of Civil Procedure 37(c) because this testimony was "not properly and timely disclosed in the MDL" and because the new opinions on clot formation in Dr. Garcia's June 2020 report are not "supplemental opinions" under Rule 26(e) and the Court's governing scheduling order. Bard further argues that Dr. Garcia's June 2020 report is prejudicial to Bard and will cause undue delay in the proceedings and that the opinions contained therein are irrelevant to the instant case.

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Here, the Court need not address whether Dr. Garcia's June 2020 report was properly or timely disclosed or whether the report constitutes a

---

[18] Greger's counsel of record has purportedly served the Dr. Garcia June 2020 report on Bard in other proceedings as well. *See* (Dkt. #55-5).

proper supplemental opinion under Rule 26(e) because the Court concludes that, in any event, Greger's alleged failure to disclose was harmless.[19]

In several cases that are nearly factually identical to this one,[20] courts have concluded that any alleged failure by the plaintiff(s) to disclose Dr. Garcia's June 2020 testimony to Bard is harmless. *Compton v. C.R. Bard*, No. 4:19-cv-00729-NKL, (Dkt. #130) (W.D. Mo. Mar. 1, 2021); *Mattle v. C.R. Bard*, No. 2:19-cv-07795-SAB, (Dkt. #47) (C.D. Cal. Mar. 22, 2021); *Wolfe v. C.R. Bard*; No. 2:19-cv-07768-SAB, (Dkt. #143) (C.D. Cal. Mar. 24, 2021); *Michaleczko v. C.R. Bard*, No. 2:19-cv-07736-SAB, (Dkt. #146) (C.D. Cal. March 24, 2021); *Taylor v. C.R. Bard*, No. 2:19-cv-01172-MJH, (Dkt. #65) (W.D. Pa. Apr. 15, 2021); *Nolen v. C.R. Bard, Inc., et al.*, No. 3:19-cv-

---

[19] In evaluating whether a violation of Rule 26 is harmless, the Fifth Circuit has enunciated a four-factor test, weighing: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003) (citation omitted); *accord Cinemark Holdings, Inc. v. Factory Mut. Ins. Co.*, No. 4:21-CV-00011, 2021 WL 2662178, at *2 (E.D. Tex. June 29, 2021) (citing *Primrose Op. Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563–64 (5th Cir. 2004)). Here—as in most cases, and as the parties' briefing reflects—"prejudice to the opposing party" is the most important factor for several reasons. First, it is difficult to assess the relative importance of Dr. Garcia's testimony at this stage of the litigation. Second, Bard has not sought, and the Court is not inclined to grant *sua sponte*, a trial continuance on the basis of this alleged failure to disclose (though the Court recently granted a Bard trial-continuance motion on the basis of a *separate* failure to disclose, *see* (Dkt. #162)). And finally, factor four either weighs in Greger's favor, or is, at best, neutral because Greger has reasonably explained that she did not disclose Dr. Garcia's testimony at the MDL because she was not a party to the MDL. Therefore, factor three—prejudice to the opposing party—is the central consideration in the Court's analysis.

[20] Bard is a defendant both in the MDL and in numerous actions remanded from and filed independently of the MDL pertaining to its IVC filters and alleged complications sustained therefrom. In several such cases, Bard has alleged that Dr. Garcia's June 2020 report should be struck for the same reasons enumerated here. And, in at least a substantial number of such cases, courts have denied Bard's motion to exclude Dr. Garcia's June 2020 testimony on the ground that Bard has long been aware of Garcia's expert designation and testimony regarding Bard's IVC filters.

0799, (Dkt. #196) (M.D. Tenn. May 28, 2021); *Pratt v. C.R. Bard, Inc. et al.*, No. 3:19-cv-02618-CEH-SPF, (Dkt. #44) (N.D. Fla. June 11, 2021).

In *Compton*, for instance, the court held that "Garcia's opinion that IVC filters can cause clot formations on the filter surface was well-known to Bard since at least 2017, and Bard has had opportunity to depose Garcia on this opinion. Bard will not be prejudiced by its admission." *Compton*, (Dkt. #130 at 8) (Mar. 1, 2021). Therefore, the court concluded that the error was harmless and denied Bard's Motion to Strike the Deficient Designations and Disclosure of Dr. David Garcia's New Post-MDL General Opinions Regarding Clot Formation and Preclude Dr. Garcia From Offering any Such Undisclosed or Improperly Disclosed Opinions in this Case. *Id.* Similarly, in *Mattle*, the court held that regardless of whether Garcia's June 2020 report properly supplemented Garcia's MDL report, any failure to disclose the June 2020 report was harmless because Bard had notice of the expert's identifying information and testimony. *Mattle*, (Dkt. #47 at 8–9) (Mar. 22, 2021).

The Court agrees. Any alleged failure by Greger to disclose Dr. Garcia's identity or testimony is harmless and, thus, Bard's motion to exclude should be denied. Here, as established in, e.g., *Compton* and *Mattle*, Bard has clearly been aware of Garcia's identity, involvement testifying on Bard IVC products, and specific opinion as to the filters' potential risks, including blood-clot-related testimony, since at least 2017. Bard has had the opportunity to depose Dr. Garcia and has done so, specifically as it pertains to blood clots, in this and other, similar proceedings.  Thus, Bard suffers no prejudice by any non- or late disclosure of Dr. Garcia by Greger. Nor

does undue delay result from any such failure to disclose; Greger designated Dr. Garcia as an expert witness some five months before the expert designation deadline, and Bard promptly deposed Dr. Garcia forty-six days thereafter.

### ii. Relevance

Finally, Dr. Garcia's opinions are relevant to the case at bar. Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Here, one element of products-liability actions is whether a product is more dangerous than a reasonable consumer would expect. Dr. Garcia's expert opinion, which provides that IVC filters are especially susceptible to producing blood clots, tends to influence the reasonable-expectation-of-dangerousness analysis. Moreover, products-liability suits involve the question of whether a product worked as intended; Dr. Garcia's testimony as to filter migration and the negative consequences associated therewith clearly shed light on the question of whether the product works as expected.

For the foregoing reasons, Defendants' Motion to Strike Plaintiffs' New Post-MDL General Opinions of Expert David Garcia, M.D. Relating to Clot Formation, (Dkt. #55), is **DENIED**.

## B. Bard's Notices Adopting Motions to Exclude or Disqualify Made in the MDL

When an MDL court has already ruled on particular *Daubert* issues, a district court may adopt such rulings in full if it agrees with the analysis and conclusions. *See, e.g.*, *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292,

at *1 n.1 (D. Ariz. July 1, 2021);[21] *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327, 2017 WL 1534199, at *1 (S.D.W.V. Apr. 27, 2017) (seven individual cases within a 28,000-case MDL were transferred to a new judge, who, after reviewing the briefing and prior order, agreed with the analysis and conclusions reached therein and, citing the "purposes of judicial consistency and efficiency," adopted the prior judge's order on motion to exclude expert testimony).

For each of Bard's docket entries numbered 59–68, Bard styled its motion as a "notice adopting" its prior motion to exclude expert testimony or disqualify made before the MDL court. Each such motion has been fully briefed before and adjudicated by the MDL court. Specifically, Bard has filed notices adopting the following motions made in the MDL court: Motion to Exclude the Opinions of Rebecca Betensky, Ph.D., (Dkt. #59), Motion to Exclude the Opinions of Mark J. Eisenberg, M.D., (Dkt. #60),[22] Motion to Exclude the Opinions of David Garcia, M.D., and Michael Streiff, M.D., (Dkt. #61), Motion to Exclude the Opinions of Darren R. Hurst, M.D., (Dkt. #62), Motion to Exclude the Opinions of David Kessler, M.D., (Dkt. #63), Motion to Exclude the Opinions of Thomas Kinney, M.D., Anne Christine Roberts, M.D., and Sanjeeva

---

[21] Granted, *McBroom*'s procedural posture was different from the instant action because *McBroom* was transferred to the district court directly from the MDL. Here, by contrast, although Bard was part of the MDL, Greger was not. This procedural distinction could conceivably be significant if Greger argued that she lacked the opportunity to litigate her case before the MDL court; however, Greger has adopted in full and incorporated by reference the MDL Plaintiffs' arguments as to motions 59–68 and asks that this Court adopt the MDL court's rulings as to such requests. Thus, Greger suffers no prejudice if the Court rules on motions 59–68 on the basis of the adopted briefing and persuasiveness of the MDL court's orders.

[22] Greger has agreed to withdraw her designation of Mark J. Eisenberg as an expert witness. Accordingly, Bard's motion to exclude, (Dkt. #60), is **DENIED as moot**.

Kalva, M.D., (Dkt. #64); Motion to Exclude the Opinions of Robert M. McMeeking, Ph.D., (Dkt. #65); Motion to Exclude the Opinions of Suzanne Parisian, M.D., (Dkt. #66); Motion to Exclude the Opinions of Robert O. Ritchie, Ph.D., (Dkt. #67); and Motion to Disqualify Robert Vogelzang, M.D., and Kush Desai, M.D., as Testifying Experts, (Dkt. #68). Because these notices adopting motions previously filed with the MDL court are, in effect, motions, the Court will treat them as such.

The Court, having reviewed all of the briefing submitted by the parties and carefully evaluated the MDL court's prior orders resolving the requests, concludes that it agrees with the analysis and conclusion of the MDL court. The Court therefore **ADOPTS** the MDL court's orders as to the expert witnesses and testimony described and relief sought in docket entries 59–68.[23]

## V. CONCLUSION

For the foregoing reasons:

Defendants' Motion to Exclude or Limit Opinions and Testimony of Darren R. Hurst, M.D., (Dkt. #46), is **GRANTED in part** and **DENIED in part**. *See supra* Part III.A.1.

---

[23] The Court understands this memorandum opinion and order to be fully consistent with the MDL court's orders as to the above-listed experts. However, to the extent either party understands the two to be incongruous, the holding in this memorandum opinion and order governs. Additionally, to the extent either party understands this memorandum opinion and order to not address an issue raised in briefing, the Court will entertain objection and argument at trial or by appropriate motion. Finally, some requests contained in the MDL court briefing are inapplicable here; hence, the Court adopts the MDL court's orders only as to the expert witnesses described in the titles of docket entries 59–68 and the relief sought therein.

Defendants' Motion to Exclude or Limit the Opinions and Testimony of Dr. Robert O. Ritchie, (Dkt. #48), is **GRANTED in part** and **DENIED in part**. *See supra* Part III.A.2.

Defendants' Motion to Exclude or Limit Opinions and Testimony of Krishna Kandarpa, M.D., (Dkt. #50), is **DENIED**. *See supra* Part III.A.3.

Defendants' Motion to Limit or Exclude Certain Opinions and Testimony of Leigh Anne Levy, RN, (Dkt. #51), is **DENIED**. *See supra* Part III.A.4.

Defendants' Motion to Exclude or Limit the Opinions and Testimony of Allyn Needham, Ph.D., CEA, (Dkt. #53), is **DENIED**. *See supra* Part III.A.5.

Defendants' Motion to Strike Plaintiffs' New Post-MDL General Opinions of Expert David Garcia, M.D. Relating to Clot Formation, (Dkt. #55), is **DENIED**. *See supra* Part III.A.6.

It is further **ORDERED** that the Court resolves docket entries 59–68 by **ADOPTING** in full the MDL court's orders as to the general expert testimony of:

- Rebecca Betensky, Ph.D., *Bard MDL*, (Dkt. #9773) (Jan. 22, 2018) (denying Bard's motion to exclude);

- Drs. David Garcia and Michael Streiff, *Bard MDL*, (Dkt. #10072) (Feb. 12, 2018) (granting in part Bard's motion to exclude);

- Dr. David Hurst, *Bard MDL*, (Dkt. #9772) (Jan. 22, 2018) (denying Bard's motion to exclude);

- Drs. Thomas Kinney, Anne Christine Roberts, and Sanjeeva Kalva, *Bard MDL*, (Dkt. #9434) (Dec. 22, 2017) (granting in part Bard's motion to exclude);

- Dr. Robert McMeeking, Ph.D., *Bard MDL*, (Dkt. #10051) (Feb. 8, 2018) (granting in part Bard's motion to exclude);

- Drs. Suzanne Parisian and David Kessler, *Bard MDL*, (Dkt. #9433) (Dec. 21, 2017) (granting in part Bard's motion to exclude);

- Dr. Robert Ritchie, Ph.D., (Dkt. #10052) (Feb. 8, 2018) (granting in part Bard's motion to exclude); and

- Drs. Scott Resnick, Robert Vogelzang, Kush Desai, and Robert Lewandowski, *Bard MDL*, (Dkt. #9432) (Dec. 21, 2017) (denying Bard's motion to disqualify Drs. Vogelzang and Desai, and Lewandowski, and denying as moot Bard's motion to exclude as to Dr. Resnick).

In view of the foregoing, the Court hereby **ORDERS** that Bard's notice adopting its MDL-court motion to exclude the opinions of and/or disqualify:

- Rebecca Betensky, Ph.D., (Dkt. #59), is **DENIED**;

- Mark J. Eisenberg, M.D., (Dkt. #60), is **DENIED as moot**;

- David Garcia, M.D. and Michael Streiff, M.D., (Dkt. #61), is **GRANTED in part**;

- Darren R. Hurst, M.D., (Dkt. #62), is **DENIED**;

- David Kessler, M.D., (Dkt. #63), is **GRANTED in part**;

- Thomas Kinney, M.D., Anne Christine Roberts, M.D., and Sanjeeva Kalva, M.D., (Dkt. #64), is **GRANTED in part**;

- Robert M. McMeeking, Ph.D., (Dkt. #65), is **GRANTED in part**;

- Suzanne Parisian, M.D., (Dkt. #66), is **GRANTED in part**;

- Robert O. Ritchie, (Dkt. #67), is **GRANTED in part**; and

- Robert Vogelzang, M.D., and Kush Desai, M.D., (Dkt. #68), is **DENIED in part** and **DENIED as moot in part**.

   So ORDERED and SIGNED this 30th day of August, 2021.


_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE