UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| MISTY GREGER | § |
| | § |
| v. | § CIVIL NO. 4:19-CV-675-SDJ |
| | § |
| C.R. BARD, INC., ET AL. | § |

## MEMORANDUM OPINION AND ORDER

Plaintiff Misty Greger brought this products-liability suit as a result of injuries allegedly caused by the implantation of one of Defendants' medical products. Before the Court is Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s Motion for Summary Judgment, (Dkt. #57). For the following reasons, the Court concludes that the motion should be **GRANTED**.

### I. BACKGROUND

**A. Factual Background**

**1. IVC Filters and the Bard G2 IVC "Recovery" Filter**

The inferior vena cava ("IVC") is a large vein through which blood passes to the heart from the lower body. Blood clots may develop in the IVC and travel to the heart and lungs, resulting in serious and even life-threatening medical complications such as heart attack, aneurysm, or stroke. The "IVC filter" is a medical device that can be implanted in the abdomen and is designed to prevent such blood clots from reaching the heart and lungs. IVC filters like the G2 "Recovery" Filter ("Recovery Filter" or "Filter") manufactured and sold by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard") are not sold directly to patients but

1

rather are prescribed by treating physicians. The Recovery Filter consists of two levels of radially distributed Nitinol struts that are designed to anchor the Filter into the IVC and to catch any embolizing blood clots. Of the struts, two are short—commonly referred to as the "arms"—and six are long—commonly referred to as the "legs." The arms principally serve to center the device, while the legs primarily prevent migration, i.e., the Filter's movement within the vein. Each strut converges at a single node, known as the cap, located at the top of the device.

In November 2002, the Food and Drug Administration ("FDA") cleared Bard's Recovery Filter for permanent use. In the clearance letter, the instructions for use ("IFU") indicate that potential complications include "[m]igration of the filter," "[p]erforation of the vena cava wall," and "[c]aval occlusion." (Dkt. #57-5 at 1). The IFU fails to include any information on imaging follow-up or a timeline for removal. The IFU is also silent on fracture or fatigue potentiality or fragment embolization to other parts of the body, e.g., the lungs. Plaintiff Misty Greger alleges, inter alia, that the Recovery Filter's IFU insufficiently warns about the incidence (relative to other filters) and seriousness of various possible occurrences, including filter tilt, migration, and fracture, especially fracture embolization to the heart and lungs. (Dkt. #114 at 4).

At the time the FDA cleared the Recovery Filter, numerous other IVC filters were on the market, at least some of which were safer than the Recovery Filter in terms of complications, i.e., rates of fracture, perforation, and migration. *See generally* (Dkt. #114 at 7–8). For instance, at the time of Greger's implantation with

the Recovery Filter, Bard's Simon Nitinol Filter ("SNF"), which has been consistently associated with a lower risk of medical complication than the Recovery Filter, was available on the market for permanent implantation as an IVC filter. (Dkt. #114 at 2 n.4). Further, by December 2004, Bard determined that the Recovery Filter had complication rates that exceeded alternative filters at statistically significant levels, as follows: for deaths, 4.6 times higher; for migrations, 4.4 times higher; for IVC perforation, 4.1 times higher; and for fractures, 5.3 times higher. (Dkt. #117-16 at 2). And, on August 3, 2005, Bard's Vice President of Regulatory Science reported that the Recovery Filter demonstrated a 4500% greater migration rate than the SNF and was linked to sixteen deaths, while the SNF was linked to zero. Of the sixteen deaths linked to the Recovery Filter, eleven stemmed from migrations to the heart and five stemmed from migrations to the pulmonary emboli. (Dkt. #114 at 9).[1]

**2. Misty Greger's Recovery Filter Implantation and Removal and Alleged Complications Therefrom**

In 2004, Greger sustained a fall and was diagnosed with Deep Vein Thrombosis ("DVT"), a type of blood clot, in her left leg. Greger consulted Dr. Carlos Cruz, who, in evaluating whether to recommend the implantation of an IVC filter—specifically Bard's Recovery Filter—conducted an individualized risk-benefit assessment. Dr. Cruz testified that, when making the assessment, he had read the Recovery Filter's IFU and was aware of the Filter's perforation and migration risks. However, Dr. Cruz

---

[1] Greger provides abundant support for the propositions that (1) the Recovery Filter was in fact more dangerous than other filters on the market and (2) Bard was aware of this fact. *See generally* (Dkt. #114 at 7–8). Moreover, Bard does not dispute these facts in its reply brief. *See* (Dkt. #129).

3

further stated that, at the time, he was not aware of the relative risks of tilt, migration, or fracture, including fracture embolization to the heart or lungs, associated with the Recovery Filter as compared to other filters. Dr. Cruz confirmed that he would have weighed comparative complication rates associated with the Recovery Filter in his risk-benefit analysis and that, if he had known the Recovery Filter's relative rates of fracture, perforation, and migration, he likely would have recommended a different filter. (Dkt. #115 at 127:12–21, 128:4–5, 137:22–138:10). As it stands, Dr. Cruz ultimately recommended the Filter's implantation, and on November 22, 2004, Dr. Cruz implanted the Filter in Greger's abdomen.

Since then, Greger has not experienced a blood clot in her heart or lungs or the life-threatening medical complications attendant to such a clot, e.g., heart attack, stroke, or aneurysm. However, in April 2013 and November 2014, Greger underwent imaging of her torso for suspected bronchitis and a shoulder injury, respectively. Both the 2013 and 2014 imaging reflect "that a fractured arm of the Filter embolized in the right upper lobe of Ms. Greger's right lung." (Dkt. #57 at 5) (citing (Dkt. #58-5 at 16, 26)). Significantly, however, "no mention of the fragment was made in the [2013 or 2014] radiology reports or by any of Ms. Greger's treating physicians." (Dkt. #58-5 at 26).

In 2018, Greger began experiencing leg pain and numbness, and in May 2019, she began experiencing significant back pain. Accordingly, on August 14, 2019, Greger visited a physician and underwent imaging of her torso. Upon doing so, Greger learned that the Recovery Filter had tilted and migrated and that struts had

4

perforated Greger's caval wall. (Dkt. #1 ¶ 72). On August 16, 2019, Greger visited Dr. James Hayhurst, a vascular surgeon, to discuss surgical options to remove the Filter. Dr. Hayhurst ordered additional imaging, determined that the Filter had migrated and pierced Greger's caval wall, and recommended an open surgery to remove the filter. Greger elected to undergo the emergency filter-removal procedure.

As a result of the displaced Filter and the procedure required to remove it, Greger alleges that she has experienced significant pain, suffering, and loss of quality of life, and that she has incurred substantial medical expenses. For instance, Greger has a twelve-inch surgery scar and continues to experience pain from nerve damage, allegedly due to the Filter, necessitating the implantation of a spinal stimulator. Greger further alleges that her earning capacity is diminished.

**B. Procedural Background**

On September 18, 2019, Plaintiff Misty Greger filed this products-liability action for damages against Bard.[2] Specifically, Greger alleges that Bard misrepresented the safety of the Filter and, inter alia, negligently designed, developed, marketed, distributed, and sold the device as safe and effective. Greger further alleges that the Filter is susceptible to various phenomena that pose unreasonable health risks, including fracturing, migrating, excessive tilting, and perforation of the caval wall. These phenomena, Greger contends, can result in life-

---

[2] Originally, Misty Greger filed this action "*et ux.*" Joey Greger, her husband. However, on January 8, 2021, the parties filed a proper stipulation of dismissal as to Plaintiff Joey Greger pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Consequently, Joey Greger has been terminated as a party and only Misty Greger remains as Plaintiff. When the Court refers to "Plaintiff" (singular) or "Greger," this denotes Misty Greger.

threatening injuries—such as hemorrhage, cardiac/pericardial tamponade, cardiac arrhythmia, and other symptoms similar to myocardial infarction, severe and persistent pain, perforation of tissue, vessels, and organs—or death, and can also result in the inability to remove the device.

Based on the foregoing factual allegations, Greger asserts the following eight causes of action against Bard: negligence (Count I), strict products liability—failure to warn (Count II), strict products liability—design defects (Count III), strict products liability—manufacturing defect (Count IV), breach of express warranty (Count V), breach of implied warranty (Count VI), fraudulent misrepresentation (Count VII), and negligent misrepresentation (Count VIII). Additionally, and consequently, Greger seeks punitive damages.

Since initiating this litigation, Greger has designated numerous expert witnesses to opine on medical, engineering, and economic questions relevant to her claims. Specifically, Greger has designated four case-specific expert witnesses and eight other general experts who previously produced opinions in a multi-district litigation proceeding ("MDL") against Bard in the District of Arizona. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL-15-02641-PHX-DGC (D. Ariz. 2015) (the "Bard MDL"). The Bard MDL was formed to conduct pre-trial discovery regarding common factual and legal issues in thousands of cases as quickly and efficiently as practicable. However, before Greger learned of her injury, the Bard MDL stopped accepting new cases. Thus, Greger filed a separate action in this Court. Notably, because "general expert discovery was completed as part of the [Bard MDL]," this

Court's Scheduling Order directed the parties to conduct only "case-specific expert discovery," except as needed to supplement general expert discovery under Federal Rule of Civil Procedure 26(e). (Dkt. #136 at 4).

In response to Greger's expert-witness and -testimony designations, and after extensive discovery, Bard filed sixteen motions to limit or exclude specific designated testimony or disqualify certain designated experts. The Court, in its Memorandum Opinion and Order, (Dkt. #167), resolved the sixteen motions to strike, and for the reasons contained therein, granted some of the motions, granted in part others, and denied the remaining motions. As particularly relevant here, the Court granted Bard's motion to exclude Dr. Darren R. Hurst's testimony that the Bard Recovery Filter specifically caused Greger's injuries. (Dkt. #167 at 12–16). Dr. Hurst is the only expert witness designated by Greger to opine on specific causation.

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "*genuine* issue of *material* fact" to succeed on a motion for summary judgment, "the mere

7

existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when, under the relevant substantive law, its resolution might affect the outcome of the suit. *Id.* at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477.

"Courts consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, the court concludes that no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### III. DISCUSSION

As a threshold matter, Bard argues that Greger's claims are barred by the relevant statutes of limitations. Specifically, Bard argues that Greger's filing this action in September 2019 was untimely because Greger's injuries manifested in 2013

8

or 2014, since which time the pertinent two- and four-year statute-of-limitations periods have lapsed.

As the parties recognize, Texas law governs each of Greger's claims. *E.g.*, (Dkt. #57 at 7); (Dkt. #114 at 11).[3] Under Texas law, the statute of limitations for a products-liability action is two years. *See* TEX. CIV. PRAC. & REM. CODE § 16.003. A two-year limitations period governs Greger's claims sounding in negligence, strict products liability, and negligent misrepresentation. *See id.* Greger's breach-of-warranty claims are subject to a four-year statute of limitations, *see Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 668 (Tex. 1999), as is her claim for fraudulent misrepresentation, TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4).

---

[3] "Texas courts resolve conflicts of law in tort claims by applying the 'most significant relationship' test set forth in the Restatement (Second) of Conflicts of Laws." *Carrillo v. Tifco Indus., Inc.*, 547 F.App'x 419, 422 (5th Cir. 2013) (citing *Gutierrez v. Collins,* 583 S.W.2d 312, 318–19 (Tex. 1979))."Under the 'most significant relationship' test . . . [t]he factors to consider in determining the applicable law for a tort case . . . are (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the residence, nationality, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 815 (5th Cir. 2017) (quoting *In re ENSCO Offshore Int'l Co.*, 311 S.W.3d 921, 928 (Tex. 2010) and citing Restatement (Second) of Conflict of Laws § 145 (Am. Law. Inst. 1971)). Further, where a party asserts breach-of-warranty claims stemming from "the same allegedly tortious conduct" that gave rise to the plaintiff's tort claims, the "most significant relationship" test counsels in favor of applying the same state's substantive law to both the warranty and tort claims. *E.g.*, *Beatty v. Isle of Capri Casino, Inc.*, 234 F.Supp.2d 651, 655 (E.D. Tex. 2002) (applying the "most significant relationship" test under Texas choice-of-law rules and determining that Louisiana substantive law applied).

Here, Greger has asserted three categories of claims: negligence, strict products liability, and breach of warranty. Because (i) Greger's injuries undisputedly occurred in Texas; (ii) the conduct allegedly causing her injuries also primarily occurred in Texas—including the distribution, sale, implantation and alleged malfunction of the Filter; (iii) Greger is a Texas resident; and (iv) Greger's and Bard's relationship principally involves her receiving the Bard Recovery Filter in Texas, Texas law governs Greger's tort claims. Further, because Greger's breach-of-warranty claims arise from the same alleged conduct that gives rise to her tort claims, Texas law likewise governs Greger's breach-of-warranty claims.

"Under the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages." *Wallace v. Kato*, 549 U.S. 384, 391, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (quotation omitted). However, "when the nature of the plaintiff's injuries is both inherently undiscoverable and objectively verifiable," *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex. 2001), Texas's "discovery rule" provides that the statutory period does not begin to toll "until a plaintiff knows or, through the exercise of reasonable care and diligence, 'should have known of the wrongful act and resulting injury.'" *Childs v. Haussecker*, 974 S.W.2d 31, 36–37 (Tex. 1998) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996); *see also Woodruff v. A.H. Robbins Co.*, 742 F.2d 228, 230 (5th Cir. 1984).

It is undisputed that Greger did not *actually* know of the wrongful act and resulting injury until August 2019, when she first learned that the Filter had perforated her IVC and Dr. Hayhurst consequently recommended surgery. In fact, Greger did not know that the device had fractured until September 2020, when Dr. Hurst discovered this fact while reviewing imaging in preparation for submitting his expert report.

As for constructive knowledge, although the fractured strut is objectively visible in both Greger's 2013 and 2014 medical imaging,[4] at no point prior to August

---

[4] In its motion, Bard cites a single page of medical records and summarizes the records as follows: "[I]maging revealed a fragment of the Filter had migrated and was embolized in Ms. Greger's right lung since at least April 2013." (Dkt. #57 at 9). However, the medical record to which Bard cites merely states that "[t]here is the presence of an inferior vena cava filter." (Dkt. #58-1 at 15). The record contains no mention of a fragment in the lung. Bard's expert witness, Dr. Morris, does opine that the Filter fragment "is clearly identified within the right

10

2019 did any of Greger's healthcare providers communicate to her or otherwise note in her medical records any issue with her Filter. (Dkt. #58-5 at 26) ("no mention of the fragment was made in the [2013 or 2014] radiology reports or by any of Ms. Greger's treating physicians."). While Greger appears not to contest that the fracture is visible to a reasonable, trained medical professional, this does not mean that Greger, viewing her own medical imaging, would be reasonably expected to ascertain the presence and significance of the strut. Greger is not a trained radiologist. Moreover, Greger's pertinent symptoms allegedly stemming from the Filter's fracture, migration, and perforation did not manifest until fall 2019. When Greger presented to the physicians in 2013 and 2014, she suspected bronchitis and a shoulder injury, respectively. Neither she nor her treating physicians suspected or concluded that the Filter was the cause of her 2013 and 2014 symptoms. Thus, Greger's conduct in 2013 and 2014 does not reflect a failure to exercise care or reasonable diligence in uncovering the Filter's alleged malfunction.

For its part, Bard cites *In re Mirena IUD Products Liability Litigation*, 29 F.Supp.3d 345, 357 (S.D.N.Y. 2014), for the following proposition: "[L]earning that a medical device had 'perforated' or 'migrated' such that surgery was required to remove it is sufficient to trigger the statute of limitations as a diligent individual would have inquired into why the device had perforated." (Dkt. #57 at 8) (quoting *Mirena*, 29 F.Supp.3d at 357). The Court agrees. But here, unlike in *Mirena*, Greger

---

lung on the PA and the lateral chest radiographs of 4/8/13 and the right shoulder radiographs of 11/20/14." (Dkt. #58-5 at 26). But Dr. Morris also concedes that Greger's healthcare providers never disclosed this fact to Greger or recorded it in the medical records.

11

did not learn that the Filter had perforated or migrated—such that surgery was required to remove it—until fall 2019, when Dr. Hayhurst informed Greger of the Filter's perforation and migration and consequently recommended and performed surgery. Indisputably, Greger filed the instant action within two years of that date.

In view of the foregoing, the applicable statutes of limitations do not bar Greger's claims in this action.

### A. No Genuine Issue of Material Fact Exists

Greger argues that numerous genuine issues of material fact remain in this case. (Dkt. #114 at 22, 26–27, 30–31, 32, 34, 40). The Court disagrees.

As explained below, *see infra* Part III.B., in complex products-liability cases, a plaintiff generally cannot establish causation without expert testimony on the matter. Here, the Court struck the specific-causation testimony of Dr. Hurst, the only case-specific expert witness designated by Greger to opine on causation.[5] Thus, whether Bard's Filter caused Greger's injuries is not a genuine issue because Greger's proffered evidence is insufficient as a matter of law to sustain a jury's finding on causation. *Gutierrez v. Arrow Int'l, Inc.*, No. SA-10-CA-470-FB, 2011 WL 13324082, at *9 (W.D. Tex. May 17, 2011) ("Absent expert testimony, [the plaintiff] cannot raise a genuine issue of material fact that [the device] manufactured by the . . . defendants . . . caused or could cause him harm.").

---

[5] While Greger has designated numerous expert witnesses to opine that Bard's IVC filters, including the Recovery Filter, can and often do cause certain medical complications, Dr. Hurst is the sole expert witness designated by Greger to testify that the Recovery Filter implanted in Greger in fact caused Greger's injuries.

12

Further, and relatedly, the Court ultimately concludes that Bard is entitled to judgment as a matter of law as to causation, which is a necessary element of each of Greger's claims. Because no genuine issue of material fact exists as to causation, and because Bard is entitled to judgment as a matter of law on causation—a necessary element to all of Greger's claims—no other alleged factual dispute *can* be genuine or material, i.e., outcome-determinative. In view of the foregoing, the Court proceeds to its judgment-as-a-matter-of-law analysis as to causation.

**B. Bard is Entitled to Judgment as a Matter of Law on Causation**

Under Texas law, causation is a necessary element of all products-liability claims, including breach of warranty. *Horak v. Pullman, Inc.*, 764 F.2d 1092, 1095 (5th Cir. 1985); *see also Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) ("Negligence and products liability claims both require proof of causation."). Further, under Texas law, a plaintiff generally cannot establish causation in complex products-liability cases without expert testimony. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). This is because "expert testimony is 'required when an issue involves matters beyond jurors' common understanding.'" *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 751 (5th Cir. 2018) (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006)). Especially relevant here, "[t]he general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007) (collecting cases). "To establish specific causation (that a product was the cause-in-fact of plaintiff's injury), an expert must

13

demonstrate a 'specific train of medical evidence' connecting the illness to the product." *Newton v. Roche Labs., Inc.*, 243 F.Supp.2d 672, 682 (W.D. Tex. 2002) (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999)).

In *Chrysler*, the wife and children of a deceased motorist sued the car manufacturer, alleging that an engine fire in the deceased's Jeep caused the fatal crash. 909 F.3d at 746. The plaintiffs asserted, inter alia, negligence and strict-products-liability claims. *Id.* The Fifth Circuit, citing ample Texas authorities, affirmed the district court's holding that "the cause of an engine fire is beyond the common experience and understanding of a lay juror" and, thus, "[t]he absence of testimony from a fire expert" on the specific cause of the fire was fatal to the plaintiffs' claims, particularly "where there was no evidence that this alleged defect had caused a fire in any other Jeep." *Id.* at 751.

Similarly, in *Wile v. Abbott*, the plaintiff alleged that her radiofrequency generator and/or grounding pad—medical devices supplied by the defendants—malfunctioned, causing her injury. 459 F.Supp.3d 803, 807 (N.D. Tex. 2020). The court held that whether either product's alleged malfunction specifically caused the plaintiff's injuries was a technical medical question and thus fell beyond jurors' common understanding, knowledge, and experience. *Id.* Therefore, the court concluded, without expert testimony on causation—which the court had previously struck—summary judgment in favor of the device manufacturer was proper as to her strict-liability, negligence, and breach-of-warranty claims. *Id.* at 809.

By contrast, in *Nelson v. Sunbeam Products*, the court concluded that no expert testimony was necessary to establish causation in a products-liability suit. No. 4:19-CV-00263, 2021 WL 1650265, at *4 (E.D. Tex. Apr. 27, 2021). There, the plaintiff sued under negligence, strict products liability, and breach of warranty theories after she fell asleep on a space heater manufactured by the defendant and sustained injuries. *Id.* at *1. The court determined that the plaintiff's theory of causation—that a space heater contacted the plaintiff's flesh for a sustained period, resulting in third-degree burns—plainly fell within jurors' "common understanding and experience" and, thus, no expert testimony was required to show causation. *Id.* at *4–5.

Although expert testimony is not always required to establish causation in products-liability cases, such testimony is necessary here. Like in *Wile* and *Chrysler*, and unlike in *Sunbeam Products*, Greger's theory of causation—that Bard's implanted intravenous medical device fractured, migrated, and/or perforated, resulting in injury—involves complex, highly technical analysis, which render it "beyond jurors' common understanding, experience, or knowledge." *Chrysler,* 909 F.3d at 751. As described above, the Filter consists of two levels of radially distributed Nitinol struts that are designed to anchor the filter into the IVC and to catch any embolizing blood clots. Various physiological impetuses may sometimes cause the Filter to migrate, fracture, fatigue, perforate the caval wall, or result in "[c]aval occlusion." *See, e.g.*, (Dkt. #57-5 at 2). In turn, the Filter malfunction may result in medical complications, including but not limited to stroke, aneurysm, or heart attack. Unlike the impact of a space heater on one's skin, as in *Sunbeam*

*Products*, the impact of an IVC filter within one's veins does not fall within the realm of common juror experience and understanding. Stated differently, lay jurors lack the requisite training and experience to ascertain—without the benefit of expert testimony on the matter—whether and how the sophisticated medical device at issue here impacted Greger physiologically. Thus, given the complexity of the Filter and its potential impact on the human body, expert testimony *on causation*, i.e., directly establishing the causal link between the defendant's allegedly defective product and plaintiff's injuries, is crucial. *E.g.*, *Newton*, 243 F.Supp.2d at 682 (quoting *Black*, 171 F.3d at 314); *Smith*, 909 F.3d at 751 (quoting *Tamez*, 206 S.W.3d at 583); *Wile*, 459 F.Supp.3d at 807.

However, the Court, in its August 30, 2021, memorandum opinion and order resolving sixteen distinct motions to limit, exclude, or disqualify as to certain expert witnesses, for the reasons contained therein, struck the specific-causation testimony of the sole expert witness designated by Greger to opine on specific causation, Dr. Darren R. Hurst, M.D. (Dkt. #167 at 12–16). Because expert testimony on specific causation is required here to prove causation—an essential element of each of Greger's claims, (Dkt. #1 at 32–44);[6] *Horak*, 764 F.2d at 1095—and because the Court

---

[6] Under Texas law, "proximate cause" is an essential element of both negligent and fraudulent misrepresentation—the two Greger claims not otherwise addressed in this memorandum opinion and order. *See, e.g.*, *Potter v. HP Texas 1 LLC*, No. 05-18-01513-CV, 2020 WL 1672556, at *7 (Tex. App.—Dallas Apr. 6. 2020, no pet.); *Affordable Power, L.P. v. Buckeye Ventures*, 347 S.W.3d 825, 830 (Tex. App.—Dallas 2011, no pet.) (negligent misrepresentation*)*; *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 856 (Tex. App.—Dallas 2011, no pet.) (fraud). "Proximate cause," in turn, "consists of (1) cause in fact, and (2) foreseeability." *Windrum v. Kareh*, 581 S.W.3d 761, 777 (Tex. 2019). Because Greger cannot demonstrate specific causation and therefore cause in fact, these claims must also fail. *See, e.g.*, *Georgia–Pacific Corp. v. Bostic*, 320 S.W.3d 588, 596–97 (Tex. App.—Dallas 2010)

16

struck the specific-causation testimony of Dr. Hurst, the sole expert designated by Greger to opine on causation, Greger cannot, as a matter of law, establish specific causation, and summary judgment is warranted as to each of her claims.

### IV. CONCLUSION

For the foregoing reasons, Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s Motion for Summary Judgment, (Dkt. #57), is **GRANTED**. It is further **ORDERED** that Plaintiff Misty Greger's claims are hereby **DISMISSED with prejudice**.

**So ORDERED and SIGNED this 30th day of September, 2021.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

---

("Because a plaintiff must prove that the defendant's conduct was a cause-in-fact of the harm, [plaintiff's] evidence is insufficient to satisfy the required substantial-factor causation element for maintaining this negligence and product liability suit."), *aff'd*, 439 S.W.3d 332 (Tex. 2014).